**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

DENA SWACKHAMMER,

      Plaintiff-Appellant,

v.

SPRINT/UNITED MANAGEMENT
CO.,

      Defendant-Appellee.

No. 05-3222

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 03-CV-2548-CM)**

---

Frank B.W. McCollum, McCollum & Parks LC, Kansas City, Missouri for
Plaintiff-Appellant.

Elaine Drodge Koch, Jeremiah J. Morgan, and Heather S. Esau Zerger, Bryan
Cave LLP, Kansas City, Missouri for Defendant-Appellee.

---

Before **LUCERO,** Circuit Judge, **MCWILLIAMS** and **EBEL**, Senior Circuit
Judges.

---

**EBEL**, Senior Circuit Judge.

---

This appeal arises from a Title VII suit brought by Dena Swackhammer

against her former employer, Sprint/United Management Co. ("Sprint"), in which

she alleged that the decision to terminate her employment was motivated by

gender discrimination. The district court granted summary judgment in favor of Sprint, holding that Swackhammer failed to satisfy her burden under the third step of the McDonnell Douglas[1] evidentiary framework to raise an inference that Sprint's explanation for her termination was a pretext to mask intentional discrimination. We agree. Sprint consistently offered a single explanation for Swackhammer's termination — that she violated the company's ethical policies — and Swackhammer failed to provide either direct evidence that this explanation was false, or evidence of differential treatment sufficient to permit an inference that the true explanation for her termination was intentional discrimination. While Swackhammer provided evidence that she was treated differently than another Sprint employee, the record does not support any reasonable inference of a discriminatory motive arising from this treatment. We therefore agree that Swackhammer failed to establish pretext and AFFIRM the district court's grant of summary judgment for Sprint.

**BACKGROUND**

**I.    Factual Background[2]**

Swackhammer was employed by Sprint as a Vice President from December 1997 until her termination in October 2002. Her supervisor from May 2001 until

---

[1]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973).

[2]We draw the basic facts from the district court's exceedingly thorough discussion in its Memorandum and Order. See Swackhammer v. Sprint/United Mgmt. Co., 2005 WL 1319058 (D. Kan. May 13, 2005).

her termination was Antonio Castanon, at that time Sprint's Senior Vice President of Customer Solutions. As her supervisor, Castanon was responsible for the decision to terminate Swackhammer. Castanon also supervised four other Vice Presidents, including Mark Alan Winters. Swackhammer, in turn, supervised several employees, including Paul Garcia, Senior Director of Database Marketing and Customer Relationship Management.

## A. Events Leading to Swackhammer's Termination

Swackhammer's termination was not related to her job performance; the parties agree that she was highly successful during her time at Sprint, receiving positive performance reviews and qualifying for an executive talent pool. However, during the summer of 2002, Sprint received anonymous complaints of unethical behavior within Sprint's Customer Service Group, alleging in particular that Garcia had inappropriately taken advantage of relationships with vendors. As a result of these complaints, Sprint Corporate Security initiated an investigation and interviewed both Swackhammer and Garcia. During Swackhammer's interview, Corporate Security asked her about various business trips and email correspondences with Garcia and confirmed that she was aware of Sprint's policies regarding travel and gifts paid for by vendors. Although Swackhammer later signed a statement prepared by Corporate Security summarizing the contents of her interview, she claims that the statement was incomplete and tended to emphasize information that negatively reflected on her and that, had she known at

the time that she, along with Garcia, was the subject of the investigation, she would have been more careful in ensuring that the statement accurately reflected her recollection of the interview. Garcia was asked similar questions in his interview, and also signed a statement summarizing his responses.

Upon completing its investigation, Corporate Security met with Castanon and Jim Kissinger, then Vice President of Human Resources, to review the results. Castanon claimed responsibility for the decision to terminate both Swackhammer's and Garcia's employment during this meeting, based on the evidence presented there. This evidence included Swackhammer's and Garcia's signed interview statements, excerpts from Sprint's policy manual concerning vendor relationships, photographs of Swackhammer and Garcia aboard a Concorde jet during a business trip, and copies of several emails sent by Swackhammer and/or Garcia. The emails contained references to expensive gifts from vendors,[3] indications that Garcia intended to bring a friend on a business trip

---

[3]The text of this email exchange between Garcia and Swackhammer reads:

> Garcia: I just received a bottle of Grand Marnier 150. If my door is closed today, be scared!!!
> Swackhammer: Who would do that to us?????
> Garcia: Enkata [a third-party vendor], project kickoff!!!
> Swackhammer: What did you score for me???
> Garcia: Michael [Garcia's contact person at Enkata] wants to get us to SF and possibly a game at Pebble (he's never been and wants to go desperately.) Don't worry, the pimp is working.

for which Sprint would pay the expenses,[4] and an exchange that Castanon interpreted to mean that Garcia intended to share confidential bid information with a third-party vendor.[5]

Although Swackhammer argues that the emails were misinterpreted by Castanon and Kissinger and that she did not violate any Sprint policy, Castanon testified that he was convinced that Swackhammer had both violated Sprint's ethical policies and failed to enforce those policies with regard to Garcia.

---

[4]One such email was sent from Garcia to a friend who did not work at Sprint, and reads:

> Garcia: Yeah, another tough week. Golf Friday and then off to Australia for a week of work. FYI, I did get invited to play golf in Aspen with Bill Clinton. Its [sic] a weekend of business cocktail parties, golf, and a speech by Bill. I may be able to bring a 'date.' Everything would be covered except air. Interested? We'd have to fly out Thursday July 18th and return that Sunday. America West and United fly to Aspen.

Another was sent from Garcia to Swackhammer, forwarding an email from a female Sprint employee; apparently referencing the same business trip as the previous email, it reads:

> Garcia: Think she'd be my date in Aspen?

[5]The text of this email, sent from Garcia to Swackhammer in response to a request to confirm the rates of one vendor whose rates Garcia had negotiated:

> Garcia: Dena, I'm actually going to discuss this with Jonathan [Garcia's contact person at the vendor] first on how to position it so he doesn't get screwed on other work if that's OK. But I DO WANT to show that we are good negotiators and do pay LESS!!!

Castanon also testified that, even if the events described in the emails never actually transpired, the "appearance of impropriety" they created was sufficient in his view to justify termination. Kissinger concurred with Castanon's assessment; the record includes notes of "Talking Points" that Kissinger prepared after the meeting, listing concerns that allegedly led to the decision to terminate Swackhammer including: (1) not properly reporting or receiving advance approval for vendor-paid entertainment; (2) participating in or allowing an unreasonable level of vendor-paid or Sprint-paid entertainment; (3) soliciting or encouraging vendor entertainment; and (4) creating potential or apparent conflicts of interest and inappropriate relationships with third parties. Kissinger's notes conclude that, from the evidence presented, there appeared to be "clear violations" of the spirit and intent of Sprint's written policy manual.

On October 14th, 2002, Castanon and Kissinger met with Swackhammer and informed her that her employment was being terminated based on the results of Corporate Security's investigation. Castanon and Kissinger terminated Garcia on the same day.[6]

## B.    Castanon's Relationship with Winters

While the investigation of Swackhammer and Garcia was ongoing, Sprint Corporate Security began investigating another anonymous complaint, this time

_____

[6]Garcia filed a separate lawsuit against Sprint, alleging that his termination was motivated by race and national origin discrimination.

involving Castanon and a male Vice-President under his direct supervision, Alan Winters. Winters and Castanon were close personal friends, having been fraternity brothers during college and working together before becoming employed at Sprint. Corporate Security's investigation of Castanon and Winters focused on allegations similar to those brought against Swackhammer and Garcia: that they accepted inappropriate vendor-paid travel and gifts, and that Castanon failed to supervise adequately Winters' compliance with Sprint's vendor policies. Because Castanon and Winters were able to provide sufficient authorization for their travels, Corporate Security apparently was unable to substantiate the allegations against them. Winters, however, admitted during an interview with Corporate Security that he had failed to review expense reports after certain business trips and, as a result, had improperly expensed several items to Sprint including a hotel movie, gift shop charges, airport parking, a meal expense, and a rental car fee from a personal trip.

Corporate Security informed Castanon and Kissinger of Winters' expense report violations at the same meeting where evidence from the investigation of Swackhammer and Garcia was presented. Castanon, however, elected not to terminate Winters; instead, he met with Winters to review the processes for properly recording expenses, and later followed up by checking Winters' expense reports to ensure that they were correctly processed. Castanon testified that, although he and Winters were close personal friends, their personal relationship

did not affect his treatment of Winters in the work context. He attributed his decision to provide coaching and counseling to Winters, rather than terminating him, to the lack of evidence of any clear violation of Sprint's ethical policies, an assessment Kissinger agreed with. However, when Castanon was terminated in August 2003 during a work-force reduction, Kissinger cited Castanon's failure to deal with a personal conflict of interest with Winters as one reason for his termination.

## II.    Procedural History

Swackhammer brought suit against Sprint in the United States District Court for the District of Kansas, alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Kansas Act Against Discrimination ("KAAD"), Kan. Stat. Ann. § 44-1001 et seq.[7] She did not offer direct evidence of discrimination, but instead invoked the burden-shifting framework from McDonnell Douglas and attempted to establish an inference of discrimination from circumstantial evidence. In support of this attempt, Swackhammer argued that Corporate Security's investigation produced insufficient evidence to support a good-faith decision by Castanon to terminate

[7]The district court noted that Title VII's standards apply to the KAAD, and thus that its holding under Title VII would also apply to Swackhammer's KAAD claims. See Best v. State Farm Mut. Auto Ins. Co., 953 F.2d 1477, 1480 n.2 (10th Cir. 1991).

her and that Castanon's decision to terminate her while not terminating Winters constituted differential treatment that was evidence of intentional discrimination.

Sprint moved for summary judgment in its favor, which the district court granted. The court applied the McDonnell Douglas framework, first holding that Swackhammer satisfied her "light burden" to prove a prima facie case of gender discrimination by showing that she: (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged despite her qualifications; and (4) was terminated "under circumstances which give rise to an inference of unlawful discrimination." Swackhammer, 2005 WL 1319058 at *18 (quoting Plotke v. White, 405 F.3d 1092, 1100 (10th Cir. 2005)).[8] The court then held that Sprint's explanation for Swackhammer's termination, namely Castanon and Kissinger's belief that she violated Sprint policies, failed to adequately supervise Garcia, and created an "appearance of impropriety" regarding relationships with vendors, was

---

[8]The more standard formulation of the McDonnell Douglas prima facie test for wrongful termination states as its fourth prong that "the job was not eliminated after [plaintiff's] discharge." Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005); Rivera v. City and County of Denver, 365 F.3d 912, 920 (10th Cir. 2004); Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1229 (10th Cir. 2000). However, in Plotke, we held that "the fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios . . . . Indeed, where an employer contends the actual reason for termination in a discriminatory firing case is not elimination of the employee's position, but, rather, unsatisfactory conduct, the status of the employee's former position after his or her termination is irrelevant." 405 F.3d at 1100. "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" Id. (quoting Kendrick, 220 F.3d at 1227 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981))).

sufficient to satisfy the "exceedingly light" burden on the employer to provide a legitimate, nondiscriminatory explanation under <u>McDonnell Douglas</u>'s second step.  <u>Swackhammer</u>, 2005 WL 1319058 at *19.

The burden thus shifted back to Swackhammer under <u>McDonnell Douglas</u>'s third and final step to establish that Sprint's proffered explanation was a pretext to conceal intentional discrimination.  <u>Id.</u>  The court held that her evidence did not raise a genuine issue of material fact as to pretext, concluding that she failed to show that Sprint's proffered explanation was unworthy of belief and that the discrepancy in treatment was explained by an alternative, nondiscriminatory reason, i.e. Castanon's close friendship with Winters.  <u>Id.</u> at 20-23.  Thus, having found no evidence to create a genuine issue of material fact as to pretext, the court granted summary judgment for Sprint.  <u>Id.</u> at 23.  Swackhammer timely appealed.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## III.  Analysis

On appeal, Swackhammer contests the district court's determination that she failed to raise an issue of material fact as to whether Sprint's proffered reasons for her termination were a pretext for intentional discrimination.  "We review the district court's grant of summary judgment *de novo* and must apply the same legal standard used by the district court."  <u>Bryant v. Farmers Ins. Exch.</u>, 432 F.3d 1114, 1124 (10th Cir. 2005) (citation omitted).  Fed. R. Civ. P. 56(c) provides that summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Under this standard, "we must view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Bryant, 432 F.3d at 1124.

## A. The Function of Pretext under McDonnell Douglas

The question of pretext arises only in the third and final step of the McDonnell Douglas inquiry, after the plaintiff has successfully established a prima facie case of discrimination and the employer has successfully articulated a legitimate, nondiscriminatory reason for the termination. Young v. Dillon Cos., Inc., 468 F.3d 1243, 1249 (10th Cir. 2006). At this point, the presumption of discrimination created by the plaintiff's prima facie case "simply drops out of the picture," St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993), and "[t]he plaintiff then carries the full burden of persuasion to show that the defendant discriminated on the illegal basis of . . . gender." Bryant, 432 F.3d at 1125.

Since a plaintiff utilizing the McDonnell Douglas framework normally cannot provide direct evidence of discrimination, a pretext argument provides a method of satisfying this burden by allowing the factfinder "to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). A plaintiff shows pretext by demonstrating "such weaknesses, implausibilities, inconsistencies,

- 11 -

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" and hence infer that the employer did not act for the asserted nondiscriminatory reasons. Plotke, 405 F.3d at 1102 (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

One typical method for a plaintiff to prove pretext is by providing direct "evidence that the defendant's stated reason for the adverse employment action was false." Kendrick, 220 F.3d at 1230. Another common method is a differential treatment argument, in which the plaintiff demonstrates that the employer "treated [the plaintiff] differently from other similarly-situated employees who violated work rules of comparable seriousness" in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff. Id. Evidence of pretext may also take a variety of other forms. "[A plaintiff] may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual." Id. (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 187-88 (1989)).

However the plaintiff may choose to demonstrate pretext, we have definitively rejected a "pretext plus" standard; in order to survive summary judgment, a plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual. Jaramillo v. Colo. Judicial Dep't, 427 F.3d

1303, 1312 (10th Cir. 2005); see also Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1135-36 (10th Cir. 2003) ("The plaintiff need not show both that the defendant's reasons were a pretext *and* that the real reason was discrimination – the fact of pretext alone may allow the inference of discrimination."). We do not always require actual evidence of discrimination because, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Reeves, 530 U.S. at 147.[9]

However, it is not *always* permissible for the factfinder to infer discrimination from evidence that the employer's explanation is unworthy of belief. "[I]f the record conclusively revealed some other, nondiscriminatory reason for the employer's [adverse employment] decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," the fact that the employer's explanation was

_____

[9]Although Reeves spoke in terms of judgment as a matter of law under Fed. R. Civ. P. 50, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" Reeves, 530 U.S. at 150.

- 13 -

unworthy of belief would no longer be sufficient to create an inference of discrimination. Id. at 148. The same reasoning applies to a plaintiff's attempts to show pretext through evidence of differential treatment; if the employer's differential treatment of similarly-situated employees is "trivial or accidental or explained by a nondiscriminatory motive," such treatment is insufficient to create an inference of discrimination. Kendrick, 220 F.3d at 1232.

This exception to the general rule against "pretext plus" makes sense because the falsity of an employer's proffered explanation, or the existence of differential treatment, defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive; where the evidence of pretext supports only nondiscriminatory motives, such an inference is logically precluded and summary judgment for the employer is appropriate. See Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1111 (10th Cir. 2005) ("In drawing such inference [of unlawful discrimination], the factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions — simply disbelieving the employer is insufficient.").

In determining whether a plaintiff's evidence of pretext is sufficient to permit an inference of discrimination and thereby avoid summary judgment, the Supreme Court has noted relevant factors "includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and

that properly may be considered" on a motion for summary judgment. Reeves, 530 U.S. at 148-49. In addition, this court has held that evidence foreclosing a rational factfinder from inferring a discriminatory motive may originate from either the plaintiff or the defendant. For example, we have held that when a plaintiff's evidence supports a nondiscriminatory motive for the employer's action and the plaintiff presents no evidence to undermine that motive, summary judgment for the employer is appropriate. Neal v. Roche, 349 F.3d 1246, 1252 (10th Cir. 2003) ("[I]t is enough [to grant summary judgment for the employer] if the plaintiff concedes a hidden motivation which the court concludes is nondiscriminatory . . . ." (emphasis omitted)); Marx v. Schnuck Markets, Inc., 76 F.3d 324, 328 (10th Cir. 1996) ("[I]f a civil rights plaintiff concedes that the real reason for the employer's action was a motive not prohibited under the civil rights laws, such a concession mandates granting of summary judgment to the employer." (citation omitted)); see also Randle v. City of Aurora, 69 F.3d 441, 451 n.14 (10th Cir. 1995) ("[T]he plaintiff's concession of a lawful motive would take the issue of motive from the jury and preclude the inference of a discriminatory motive . . . ."). We have also upheld summary judgment for the employer based on the employer's own alternative, nondiscriminatory explanations, so long as they remain unrebutted and the employer's credibility has not been so damaged as to render such explanations suspect. See Jaramillo, 427 F.3d at 1309-10 ("[A]s a general rule, an employee must proffer evidence that

- 15 -

shows each of the employer's justifications are pretexual." (quoting Tyler v. Re/Max Mountain States, 232 F.3d 808, 814 (10th Cir. 2000)).

Thus, with these considerations in mind, we proceed to consider Swackhammer's evidence that Sprint's explanation for her termination was pretextual.

**B.     Swackhammer's Evidence that Sprint's Decision was Pretextual**

Throughout the proceedings below, Sprint consistently offered one explanation for Swackhammer's termination: that she was terminated for violating Sprint's ethical standards.  In attempting to dismiss this explanation as unworthy of belief, Swackhammer presented two types of pretext evidence: evidence intended to directly demonstrate the falsity of Sprint's explanation, and evidence of Castanon's differential treatment of Swackhammer and Winters.  We consider each in turn.

**1.     Evidence of the Falsity of Sprint's Explanation**

Swackhammer first attempted to demonstrate that violation of ethical policies was not the true reason for her termination by arguing that Sprint should not have permitted Castanon to decide whether she was to be terminated because Castanon was under investigation for similar ethical violations at the time; that the evidence Corporate Security presented to Castanon and Kissinger was insufficient to support Swackhammer's termination; and that Castanon should

- 16 -

have consulted with Swackhammer and considered her previous work record prior to making the decision to terminate her.

Swackhammer's arguments fail to raise a genuine issue of material fact as to the falsity of Sprint's proffered explanation. Evidence that the employer should not have made the termination decision — for example, that the employer was mistaken or used poor business judgment — is not sufficient to show that the employer's explanation is unworthy of credibility. Young, 468 F.3d at 1250; Simms v. Okla. ex rel. Dep't of Mental Health, 165 F.3d 1321, 1330 (10th Cir. 1999). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." Rivera, 365 F.3d at 924-25 (internal quotation marks and alterations omitted).

Although Swackhammer did not, at the summary judgment stage, have a burden to establish conclusively whether Castanon's stated reliance on the results of the investigation was pretextual, she was required to "establish that there is a genuine factual dispute with regard to the truth." Bryant, 432 F.3d at 1126. Viewing Swackhammer's evidence in the light most favorable to her position, this evidence demonstrates that Sprint may have been unwise and that Castanon may have utilized questionable judgment, but it does not draw into question whether Sprint or Castanon actually relied, honestly and in good faith, upon the appearance of improprieties arising from the evidence gathered in Corporate

- 17 -

Security's investigations. Swackhammer's arguments that Castanon "should have known that the misconduct she was accused of engaging in was completely out of character" and that Castanon "should have reconsidered whether it was appropriate to terminate [her] employment" are simply beside the point; it is not what Castanon *should* have known that matters, but whether he acted in good faith upon the beliefs he held. In addition, her contention that the evidence gathered by Corporate Security during its investigation was insufficient to support a good-faith belief that Swackhammer "actually engaged in misconduct" ignores Castanon's testimony that it was the appearance of impropriety arising from the evidence that mattered most to him.

Indeed, Swackhammer implicitly conceded in her deposition testimony that she could not directly prove Castanon's reasons for terminating her were false; instead, she fell back on her differential treatment argument: "the *only thing I have* is that Tony [Castanon] and Alan [Winters] were best friends, and that Alan was a man, and he was treated differently than I was, as was Tony" (emphasis added). Without more than this, the district court correctly held that Swackhammer failed to directly raise an issue of fact regarding the falsity of Sprint's explanation.[10]

_____

[10]At oral argument, Swackhammer focused on an additional piece of testimony she claims undercuts Sprint's explanation: a portion of Kissinger's deposition testimony which Swackhammer summarizes as stating that "Castanon favored males over females." Contrary to her interpretation, however, we are

(continued...)

## 2.  Differential Treatment of Swackhammer and Winters

We turn next to Swackhammer's attempt to establish pretext by showing that Castanon treated her differently than he treated Winters under similar circumstances.  The district court rejected this argument because it found that, assuming that the two were similarly situated,[11] the disparity in treatment was caused by Castanon's close friendship with Winters and therefore did not allow for an inference of gender discrimination.  Swackhammer, 2005 WL 1319058 at *22.  We agree with the district court's result, if not the entirety of its reasoning: while Swackhammer's evidence may have established differential treatment, the record conclusively revealed two nondiscriminatory explanations for the discrepancy and left no room for an inference of discrimination, thus requiring summary judgment for Sprint.

---

[10](...continued)
unable to read the statement she cites as implying any gender bias on Castanon's part.  Although Kissinger testified that there was a "perception" that Castanon treated his other reports differently from Winters, Kissinger stated that he believed this "perception" arose from Castanon's friendship with Winters and "had nothing to do with gender discrimination."  Thus, even read in the light most favorable to Swackhammer's position, Kissinger's testimony does not constitute evidence of pretext.

[11]"Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."  Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997).  In addition, to demonstrate pretext through differential treatment, it must be shown that the employees "violated work rules of comparable seriousness."  Kendrick, 220 F.3d at 1230.  For purpose of resolving this appeal, we assume without deciding — as did the district court — that Swackhammer and Winters were similarly situated.

Castanon testified that he treated Winters more leniently than Swackhammer because the former's misconduct was of a less serious nature than the latter's. During her deposition testimony, Swackhammer contested this explanation and stated her belief that Castanon treated Winters favorably because of their long friendship:

> SWACKHAMMER: Now, why would they do that [terminate Swackhammer but not Winters]? There was some ulterior motive. What was it? Well, it looks like Tony [Castanon] was covering for himself and for Alan [Winters]. I mean, they were also under investigation.
> Tony had been interviewed by Corporate Security just a couple of days before I was terminated. I don't even know if they had made a decision on him yet. It was clear to me that I was being offered up as a sacrifice so that he and his buddy Alan would not have any adverse action taken against them. . . .
>
> Q: Did you think Paul Garcia was also being offered up as a sacrifice to protect Tony Castanon's job?
> SWACKHAMMER: I believe that they looked at my case and Paul's case as an opportunity to take action to save themselves. . . .
> And the only thing I have is that Tony and Alan were best friends, and that Alan was a man, and he was treated differently than I was, as was Tony.

Sprint, in its motion for summary judgment, seized upon this testimony and argued that Swackhammer had conceded that any differential treatment resulted from Castanon's close relationship with Winters, rather than providing evidence of underlying gender discrimination.[12] Additional record evidence also supported

---

[12]Sprint did not itself concede that Castanon was in fact motivated by a desire to save his and Winters' job, but continued to maintain that Castanon's

(continued...)

- 20 -

this explanation; both Kissinger and Castanon testified that Castanon and Winters had long been close personal friends and that Castanon had been known to treat Winters differently than any of his other direct reports, male or female; for instance, Castanon hosted and paid for a birthday party for Winters, something he had not done for any other Sprint employee.

Swackhammer responded by denying that she conceded a nondiscriminatory explanation for her termination, arguing that her statement "the only thing I have is that Tony and Alan were best friends, and that Alan was a man, and he was treated differently than I was, as was Tony" supported her continuing belief that gender played a role in her termination. She also noted Castanon's testimony in which he denied that his friendship with Winters affected his decisionmaking and claimed to have held Winters to the same standards as any other Sprint employee.

From this evidence and argument, the district court concluded that "Castanon's different treatment of Winters clearly stems from their close friendship. Winters benefitted from Castanon's favoritism toward him." Swackhammer, 2005 WL 1319058 at *22. As a finding of fact upon a motion for summary judgment, this conclusion is erroneous. Viewing the evidence in the light most favorable to Swackhammer, see Bryant, 432 F.3d at 1124, there existed a genuine issue of fact as to whether the differential treatment was due to the

<hr>

[12](...continued)
decision was based solely on the results of Corporate Security's investigation and that Swackhammer's claims of preferential treatment for Winters were wrong.

difference in severity between Swackhammer's and Winters' ethical violations, or instead due to Castanon's friendship with Winters and his desire to protect his and Winters' job. Thus, the district court should not have taken it upon itself to determine which of these was the true explanation.

However, we conclude that this error was harmless because, whichever evidence the factfinder might have chosen to credit, neither version permits an inference of gender discrimination. If one credits Castanon's testimony, then his differential treatment of Swackhammer and Winters was nondiscriminatory, based on his conviction that Swackhammer's misconduct was more serious than Winters'. If, alternatively, the factfinder credited the evidence of Castanon's favoritism towards Winters, then the differential treatment, while perhaps unfair, was similarly nondiscriminatory. Neal, 349 F.3d at 1251 ("[A]n employer's actions based on loyalty to a friend . . . are not considered 'discriminatory,' even where they benefit the nonprotected friend . . . at the expense of a more qualified, protected person.").[13] In the latter scenario, Castanon's explanation for the differential treatment would have been proven unworthy of belief — but only

_____

[13]We do not mean to suggest that a friendship between a supervisor and a coworker will always foreclose any inference of discrimination. Favoritism may indeed be a proxy for gender discrimination. For example, if a plaintiff presented evidence regarding the nature of the supervisor's friendships that indicates a strong preference for or exclusion of a particular gender, a court could conclude that she had sufficiently established pretext to survive summary judgment. However, the mere fact that a supervisor has one close friend of the same gender, without more, is not enough to support such a conclusion.

because it concealed an equally nondiscriminatory explanation. The record contains no independent evidence, beyond Swackhammer's mere conjecture, that would allow a reasonable factfinder to disbelieve both explanations and thereby to infer that gender discrimination was the actual motivation for her termination. See Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) ("[P]laintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."). Thus a reasonable factfinder could not, based on the record in this case, infer a discriminatory motive from the difference in treatment between Swackhammer and Winters.

Before concluding, we address a final argument upon which Swackhammer places considerable emphasis on appeal. She argues that our precedent in Neal and Randle supports summary judgment based on a nondiscriminatory explanation for differential treatment only if the plaintiff has expressly conceded that explanation and advances no other possible explanation before the court. She contends that she never made such a concession, but at all times asserted her belief that gender played a role in her termination, and therefore that the district court's reliance on the nondiscriminatory explanation arising from her testimony was erroneous. We do not, however, read Neal — which relied upon and interpreted footnote 14 from Randle, 69 F.3d at 451 — as requiring a plaintiff to concede that a nondiscriminatory motive was the only motivation for the

employer's actions in order to justify summary judgment for the employer; indeed, the Neal plaintiff did not do so, making "several arguments concerning pretext" including attempts to show that her race played a role in her termination. Neal, 349 F.3d at 1248-49. Rather, we held in Neal that the plaintiff conceded a nondiscriminatory motive because she provided arguments in her summary judgment materials as a part of her "position before the court" that supported such a nondiscriminatory motive, and because her other evidence was insufficient to permit an inference of any discriminatory motive. Id. at 1251, 1252-53.

The facts in this case are similar. Swackhammer did not merely mention Castanon and Winters' relationship in her deposition testimony, but actually argued to the district court that Castanon and Winters were "long-standing personal friends" whose families vacationed together and that Castanon was terminated, in part, because he failed to "deal with a personal conflict of interest with [his] close personal friend, Alan Winters." The only evidence she presented that tended to undermine this motive, aside from her own conjecture, was Castanon's original explanation that he had terminated Swackhammer for violating Sprint's ethical policies — evidence which, if believed, supports only another nondiscriminatory explanation.

In any case, contrary to Swackhammer's assertions, the district court did not rely solely on Neal's interpretation of Randle's footnote 14 for its grant of summary judgment, and we do not do so here. Neal and Randle's footnote 14

- 24 -

present one example of circumstances where the record undermined a plaintiff's claim of discrimination by supplying a convincing nondiscriminatory motive for the employer's actions which the plaintiff failed to overcome; this case simply presents another.

To paraphrase the Supreme Court, "although the plaintiff has established a prima facie case and set forth sufficient evidence" of differential treatment, "no rational factfinder could conclude that the action was discriminatory." Reeves, 530 U.S. at 148. Thus, Swackhammer failed to carry her burden at the pretext phase of the McDonnell Douglas analysis to create an inference of discrimination, and the district court properly granted summary judgment for Sprint. See id. at 143 ("[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." (quotation omitted)).

IV. **Conclusion**

Viewed in the light most favorable to Swackhammer's claim of gender discrimination, the record in this case demonstrates that she was treated differently from Winters, another similarly-situated Sprint employee. However, the record also supports only two explanations for the difference in treatment between Swackhammer and Winters: either Swackhammer's misconduct was more egregious and therefore merited a harsher response, or her supervisor's close friendship with Winters led to Winters receiving favorable treatment. Neither of

these explanations allows a reasonable factfinder to reach an inference of illegal gender discrimination. Thus, because Swackhammer presented no additional evidence which might allow such an inference of discrimination, she has failed to satisfy her burden to demonstrate pretext under the third step of the McDonnell Douglas framework. We therefore AFFIRM the district court's entry of summary judgment in favor of Sprint.