**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOHN SEASTRAND, an individual,

    Plaintiff - Appellant,

v.

U.S. BANK N.A., a nationally chartered bank,

    Defendant - Appellee,

and

RALPH PACE, an individual acting in his official capacity as an officer and employee of U.S. Bank, N.A.; JACKLYN W. MILLER; GARY S. MILLER; JAY M. MINNICK, individuals; MILLER DEVELOPMENT COMPANY, INC., a Utah corporation; MILLER MINNICK ASSOCIATES I LLC ; MILLWOOD COMPANIES, LC, Utah limited liability companies, and JOHN DOES 1-10,

    Defendants.

No. 19-4091
(D.C. No. 2:17-CV-00214-TS)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **HOLMES**, **PHILLIPS**, and **CARSON**, Circuit Judges.
_____

John Seastrand appeals the district court's grant of summary judgment to his former employer, U.S. Bank, N.A. (bank), on his age discrimination claim brought under 29 U.S.C. § 623(a)(1). We affirm.

I

Mr. Seastrand was employed by the bank from 2002 until he was terminated in April 2016. At the time he was fired, Mr. Seastrand was 52 years old and had been working for some ten years as a senior vice president/market manager in the bank's commercial real estate group. In that capacity, Mr. Seastrand supervised several employees and was responsible for growing revenue, communicating with clients, and managing client relationships.

Prior to his termination, Mr. Seastrand had been negotiating a construction loan with a long-time client, Miller Development Company, Inc., and its chief executive, Jay Minnick. As a result of those negotiations, in July 2015, the bank agreed to lend an affiliated company, Miller Minnick Associates I, LLC, $46.85 million to fund an apartment development.[1] The loan was approved by several bank employees, including Mr. Seastrand and his supervisor, Ralph Pace. As is typical, the loan was to be disbursed in installments or "draws" as construction

_____

[1] Miller Development Company, Inc., and Millwood Companies, L.C., are owned by Gary and Jacklyn Miller. Unless otherwise specified, we refer to these defendants, as well as Miller Minnick Associates I, LLC, and Mr. Minnick, collectively as the "Miller Defendants."

progressed.  Although the bank expected an initial draw for lumber and other construction materials ("stored materials"), stored materials are usually incorporated into a project within 60 days.  According to Mr. Pace, it would have been "abnormal" to approve a stored-materials draw of several million dollars; it also would be "abnormal and outside of standard operating procedure" to approve a significant stored-materials draw when the materials "would not be incorporated into a project for a lengthy period of time."  Aplt. App., Vol. 13 at 1912.

The loan closed on July 23, 2015, at which time the Miller Defendants requested an initial draw of some $6.8 million, with more than $4.3 million allocated to purchasing stored materials.  *Id.*, Vol. 9 at 1312.  Mr. Seastrand did not want to summarily deny the draw, so on July 25, he contacted Mr. Minnick, who told him that approving the draw would enable the Miller Defendants to purchase stored materials in bulk at a substantial savings.  According to Mr. Seastrand, Mr. Minnick "made a strong appeal" to approve the draw, reminding him of their "long-term relationship" and the Miller Defendants' "history of performance."  *Id.*, Vol. 11 at 1690.  Although Mr. Seastrand recognized that approving the draw would be "an accommodation," *id.* at 1609, 1677, he conferred with the bank's loan administrator, Bill Libal, and authorized the draw.[2]

---

[2] Mr. Seastrand testified that he authorized the draw subject to credit approval. *See* Aplt. App., Vol. 11 at 1693-95.  He maintained that the bank's credit department remained involved in the financing after closing, *id.* at 1686, and testified that bank records would reflect the subsequent credit approval, *id.* at 1694-95.  Bank records do reflect a closing credit approval on July 22, 2015, the day before the loan agreement was executed, *see id.*, Vol. 8 at 1173, but there are no records of a subsequent credit

Several months later, construction was behind schedule. Mr. Minnick reassured Mr. Seastrand of the project's status, but in March 2016, Mr. Seastrand learned that Mr. Minnick was seeking an additional $7 million loan from other sources to alleviate cash-flow problems. That prompted Mr. Seastrand's subordinate, Michelle Pearce, to schedule a third-party site inspection. When the Miller Defendants learned of the inspection, they indicated to Ms. Pearce there might be a "discrepancy" between the amount of stored materials purchased with the initial draw and the amount of stored materials available for inspection. *Id.*, Vol. 13 at 1878. Indeed, the inspection, conducted on April 5, 2016, located $761,000 worth of stored materials. But the initial draw allocated $4.3 million to stored materials, and the bank held an additional security interest in another $3.8 million of stored materials. Thus, the bank's total interest in unaccounted-for stored materials was $8.1 million.

On April 8, after Mr. Pace learned of the trouble, he notified his supervisor, Rex Rudy, that the loan was in jeopardy and he would be consulting with the bank's Special Assets Group (SAG), which handled its distressed loans. On April 11,

---

approval, *see id.*, Vol. 13 at 1915 (Pace Decl.); *see also id.*, Vol. 12 at 1831-32 (Huppert Depo.). Indeed, when pressed for such evidence, Mr. Seastrand referenced the closing credit approval on July 22, 2015, *see id.*, Vol. 11 at 1677-78. Senior credit officer Kurt Huppert explained that there was a general expectation in the closing and disbursement process that deviations from the underwriting policy would be elevated to senior credit officials for "credit concurrence." *Id.*, Vol. 12 at 1840-41. He testified that he had not seen a draw with "this high of a level [of risk] approved in [his] 33 years of real estate lending," *id.* at 1842, but there were no specific underwriting limits on stored materials for this particular loan and that by failing to elevate the draw request to other senior officers, Mr. Seastrand "assumed all responsibility for that decision." *Id.* at 1851. He also recalled that Mr. Seastrand acknowledged "it was his decision." *Id.* at 1852.

Mr. Pace met with Mr. Seastrand, Ms. Pearce, and the senior credit officer, Kurt Huppert, to evaluate the situation and develop a plan of action. They attempted to ascertain the specific dollar amount at risk and discussed issuing a default letter with a reservation of rights and consulting with SAG. According to Mr. Pace and his contemporaneous notes from the meeting, Mr. Seastrand disclosed that he had approved the stored "materials advance for [$]6.8 million[] after speaking with Miller," who wanted to "buy[] materials early because of a better price." *Id.*, Vol. 12 at 1749; *see also id.*, Vol. 9 at 1336. Mr. Pace also noted that Mr. Huppert indicated at that time that the loan only allowed "funding of initial approved stored materials . . . with credit approval. Any advanced stored materials require[d] [credit] approval." *Id.*, Vol. 12 at 1750; *see also id.*, Vol. 9 at 1336.

By April 14, the bank was in the process of downgrading the loan's risk status. An email on that date from Mr. Rudy to Mr. Pace had the subject line, "Impending Downgrade," and read: "The more I think about this, the more disappointed I am. . . . How do we have so little equity in the project ahead of our debt funding?" *Id.*, Vol. 9 at 1339. Mr. Pace replied, "[T]here are concerns about how we got here. . . . [A] further conversation between just the two of us is warranted." *Id.*

The next day, April 15, the bank issued the Miller Defendants a notice of default, claiming the loss of stored materials breached the loan agreement. The same day, Mr. Pace spoke by phone with Mr. Seastrand, Ms. Pearce, and Mr. Huppert about the stored materials. As memorialized in his contemporaneous notes from that meeting, they discussed how their handling "of stored materials failed on magnitude

5

of funding[ and] failed on stored materials inspections." *Id.*, Vol. 12 at 1751; *see also id.*, Vol. 9 at 1341. He also noted, "[G]ot talked into it, John takes responsibility, construction was anemic, John capitulated, emotional." *Id.*, Vol. 12 at 1751; *see also id.*, Vol. 9 at 1341. Mr. Pace explained that Mr. Seastrand was emotional during the meeting and stated—as he had on other occasions—that maybe Mr. Minnick "convinced him that it was the right thing to do," referring to approving the stored-materials draw, and that Mr. Seastrand "got talked into it." *Id.* at 1752.

During this time, Mr. Pace spoke with Mr. Rudy and once again memorialized their discussion in contemporaneous notes. In particular, he noted that they had a "big issue" regarding "judgment." *Id.* at 1754; *see also id.*, Vol. 9 at 1343. They discussed concerns with the decision "to allow funding for stored materials at such an early stage" of the construction project and that, in researching the loan agreement, there was a "60-day requirement to deploy stored materials [into] the project after funding." *Id.*, Vol. 12 at 1754; *see also id.*, Vol. 9 at 1343. Additionally, Mr. Pace noted, "We have to be able to expect more from our senior leaders. This decision creates a significant financial expense that [is] . . . lost to [the] bank." *Id.* at 1754-55; *see also id.*, Vol. 9 at 1343.

On April 20, Mr. Pace spoke with Brian Bebel, the bank's director of human resources. Mr. Pace could not recall if they discussed the prospect of firing Mr. Seastrand at that time, but his notes reflect that they discussed a past employment incident in which Mr. Seastrand exhibited poor judgment and was disciplined as a result. Mr. Bebel referred to this incident as the "Mirinda loan" and informed

6

Mr. Pace that, at the time of that incident, "some wanted [Mr. Seastrand] fired." *Id.*, Vol. 12 at 1764. As Mr. Bebel recounted their conversation, the reason Mr. Pace contacted him was because Mr. Seastrand "had another issue with a client" in which he "approved or allowed . . . some monies that he shouldn't have," and Mr. Pace understood there was "some history with John"; he was therefore "trying to gather context." *Id.* at 1811. Mr. Bebel explained to Mr. Pace that while working on the Mirinda loan, Mr. Seastrand solicited employment opportunities from the client, which the client interpreted as an implied quid pro quo. The matter was referred to the bank's legal counsel for investigation, during which Mr. Seastrand repeatedly denied the allegations. But when Mr. Bebel and Mr. Seastrand's former supervisor confronted him, Mr. Seastrand "changed his position and said he had actually propositioned the borrower." *Id.* at 1807. Mr. Bebel thought Mr. Seastrand should have been fired at that time because he repeatedly denied the allegations during the investigation. In Mr. Bebel's opinion, Mr. Seastrand exhibited a lack of truthfulness, "[p]oor judgment, [and] poor decision-making as a leader," and he thought that, from a borrower's perspective and as a matter of ethics, "[Mr. Seastrand] should be terminated." *Id.* at 1808. Mr. Seastrand's former supervisor agreed that he exhibited "real poor judgment," describing his conduct as "stupid." *Id.* at 1764. But rather than fire him, she referenced the incident in his performance review and reduced his bonus.

Also on April 20, Mr. Pace spoke with Mr. Seastrand, who asked whether disciplinary action would be taken against him. He acknowledged his mistake and

7

recognized it could cost him his job, but Mr. Pace told him he would likely receive a written warning, though that could change. Mr. Pace emphasized that Mr. Seastrand had exhibited very poor judgment and that there were concerns it could cost the bank money.

Then on April 26, Mr. Pace spoke again with Mr. Bebel. This time they "were leaning towards a termination." *Id.* at 1768. Referring to his notes, Mr. Pace explained that they considered Mr. Seastrand's history of prioritizing neither the bank's interests nor his clients' interests and there was "great concern moving forward with him in such [a] high-profile position with decision-making authority and access to clients." *Id.* at 1767. Mr. Pace also observed that they reviewed Mr. Seastrand's previous performance appraisals and noted that his termination was "[n]ot what we want." *Id.* at 1768. But his notes also indicated, "Professional judgment used, can't do stupid stuff, second event. . . . [F]ire him." *Id.*

The next day, April 27, Mr. Pace convened a meeting with Mr. Bebel, Mr. Rudy, and the vice chair and head of corporate and commercial banking, Jim Kelligrew. The subject of the meeting was to discuss the action to be taken against Mr. Seastrand. Mr. Pace, Mr. Rudy, and Mr. Bebel all agreed that Mr. Seastrand "had exhibited very poor judgment in approving the large Stored Materials draw and equity credit." *Id.*, Vol. 13 at 1917. And, coupled with his conduct while working on the Mirinda loan, there was a consensus among them that Mr. Seastrand should be fired. Mr. Kelligrew declined to participate in the decision, but he advised the other officials to "do the right thing" and not act "to save face." *Id.*, Vol. 9 at 1350.

8

Accordingly, after conferring with Mr. Rudy one last time, Mr. Pace met with Mr. Seastrand on April 29, 2016, and informed him that his employment with the bank was terminated.

## II

Following his termination, Mr. Seastrand brought this action in Utah state court, claiming he was fired in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1).[3] The bank removed the suit to federal court and moved for summary judgment. The district court granted the motion. The court assumed that Mr. Seastrand made a prima facie case of age discrimination and that the bank offered a legitimate, non-discriminatory reason for terminating him. Thus, the court considered whether Mr. Seastrand offered sufficient evidence to demonstrate that the proffered reason for his firing was pretext for discrimination. Concluding that he did not, the court ruled in favor of the bank.

## III

"We review the district court's grant of summary judgment de novo, applying the same standard used by the district court." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114 (10th Cir. 2007). "Summary judgment is appropriate only if

---

[3] Mr. Seastrand named Mr. Pace as an individual defendant on his ADEA claim, but he later voluntarily dismissed that claim. He also asserted claims of conspiracy, fraud, negligence, and intentional interference with economic relations against the Miller Defendants but stipulated to the dismissal of those claims after summary judgment briefing on those claims was complete. None of these claims are before us.

'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Id.* (ellipsis omitted) (quoting Fed. R. Civ. P. 56(c)).

Under the ADEA, an employer is prohibited from "'discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age.'" *Jones v. Okla. City Public Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010) (brackets and emphasis omitted) (quoting 29 U.S.C. § 623(a)(1)). In evaluating an ADEA claim, we apply the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Jones*, 617 F.3d at 1278. Under that framework, a plaintiff must establish a prima facie case of age discrimination by showing: "1) [he] is a member of the class protected by the ADEA; 2) [he] suffered an adverse employment action; 3) [he] was qualified for the position at issue; and 4) [he] was treated less favorably than others not in the protected class." *Id.* at 1279 (brackets and internal quotation marks omitted). If the plaintiff satisfies his initial burden, the defendant must then provide a legitimate, nondiscriminatory reason for the adverse employment action, upon which the burden shifts back to the plaintiff to show the proffered reason is pretext for unlawful discrimination. *Id.* at 1278.

To show a fact issue on pretext, the plaintiff must present evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1280 (internal

10

quotation marks omitted). In analyzing for pretext, we do "not second guess the business judgment of the employer." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks omitted). Indeed, "[e]vidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Id.* at 970-71 (internal quotation marks omitted).

We, like the district court, may assume without deciding that Mr. Seastrand established a prima facie case of discrimination and that the bank provided a legitimate, nondiscriminatory reason for firing him: he exercised poor judgment in approving the stored-materials draw, which was particularly apparent in light of his handling of the Mirinda loan.[4] We therefore consider whether he presented sufficient evidence of pretext.[5]

Mr. Seastrand offers four overlapping arguments as to why the bank's reason for firing him was pretext for discrimination. He contends the bank has given

---

[4] Contrary to Mr. Seastrand's assertion, the parties did not acknowledge that he presented sufficient evidence to establish his prima facie case. *See* Aplt. Br. at 31. Rather, the district court *assumed* he made a prima face case and that the bank proffered a legitimate, nondiscriminatory reason for his dismissal. *See* Aplt. App., Vol. 30 at 4419.

[5] The bank offers an alternative basis for affirming. The bank contends that in opposing summary judgment on his claims against the Miller Defendants, Mr. Seastrand effectively conceded that a factfinder could conclude the bank fired him for a nondiscriminatory reason attributable to the Miller Defendants' fraudulent and tortious conduct. *See* Aplee. Br. at 22-29. Because we resolve this appeal on the issue of pretext, we need not consider the bank's alternative argument.

shifting explanations for why he was fired, its explanations are false, it never conducted an adequate investigation before firing him, and there is additional evidence of age discrimination at the bank. We consider these arguments in turn.

*A. Shifting Explanations*

Mr. Seastrand first contends that, at various times, the bank has provided shifting explanations for his termination. He asserts the bank now says he was fired for his poor judgment in handling the stored materials draw, but when he was fired, Mr. Pace told him: "Your credibility due to the Miller situation cannot be recovered." Aplt. Br. at 36 (internal quotation marks omitted). And yet when he filed his complaint with the EEOC, the bank justified its decision by citing the harm done to the bank from the Mirinda loan, his lack of attention to detail, and his independent approval of the stored materials draw.

Mr. Seastrand is correct that a change in explanations might suggest pretext, *see Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005), but we see no meaningful difference in the explanations he cites. The bank's decision-makers consistently stated he was fired for exercising poor judgment in approving the stored-materials draw, which was particularly apparent in light of his handling of the Mirinda loan. Although Mr. Pace told him he was fired because he lost his credibility working with the Miller Defendants, this is but a semantic distinction from firing him for exercising poor judgment in approving the draw.

Additionally, while the bank referenced Mr. Seastrand's lack of attention to detail in its EEOC response, that comment merely explained how his poor judgment

12

in working on the Mirinda loan, coupled with his lack of attention to detail, portended his firing for approving the stored-materials draw. *See Standard v. A.B.E.L Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir. 1998) (holding that specific explanations for more general basis of termination are insufficient to show pretext). The bank's EEOC response described the circumstances of the Mirinda loan and indicated that Mr. Seastrand's manager subsequently noted his lack of attention to detail as evidenced by, among other things, "missing client monitoring information." Aplt. App., Vol. 23 at 3857. The EEOC response then detailed Mr. Seastrand's approval of the stored-materials draw and noted that the stored materials were not discovered missing until the third-party inspection. Read in context, the bank's reference to his lack of attention to detail simply explained how insufficient client monitoring lead to the loss of stored materials and ultimately his termination.

As for the bank's reference to the Mirinda loan, the evidence confirms that the bank's decision-makers were troubled by that incident, which they believed exemplified Mr. Seastrand's pattern of exercising poor judgment. It was not a separate, distinct explanation, but rather another example of his poor judgment, which was the basis for his termination. Mr. Seastrand fails to show the bank proffered shifting explanations for firing him.

*B. False Explanations*

Mr. Seastrand also contends the bank's explanations were false. First, he asserts his poor judgment must be pretext for discrimination because he had consistently satisfactory performance reviews, he secured a $1 billion loan, and the

13

Mirinda loan was a significant source of revenue for which he received a $95,000 bonus. But we may not second-guess the bank's business judgment. *See DePaula*, 859 F.3d at 970. Even if Mr. Seastrand was a satisfactory, profitable employee, none of these circumstances suggests the bank's reason for firing him was false or that the decision-makers did not honestly believe he exhibited poor judgment, both in soliciting a job while working on the Mirinda loan and in approving the stored-materials draw for the Miller Defendants. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007) ("The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.").

Second, Mr. Seastrand argues it is false that he made the "unilateral decision" to approve the stored-materials draw. Aplt. Br. at 41 (internal quotation marks omitted). He says the draw was processed by the loan administrator, Mr. Libal, and he had no authority to approve the draw. The record does indicate that Mr. Libal *processed* the draw, but it also indicates that he did so with Mr. Seastrand's approval. *See, e.g.*, Aplt. App., Vol. 11 at 1693-94. Whether Mr. Seastrand had authority to approve it independently is immaterial because the evidence shows he did approve it and that he repeatedly took responsibility for doing so. *See, e.g., id.*, Vol. 9 at 1341 (Apr. 15, 2016 meeting notes); *id.*, Vol. 12 at 1748-49 (Pace Depo.); *id.*, Vol. 13 at 1915 (Pace Decl.). The only rebuttal evidence Mr. Seastrand offers does not suggest otherwise. He attempts to deny that he accepted responsibility for approving the draw at the April 15 meeting, which included himself, Mr. Pace, Mr. Rudy,

14

Mr. Huppert, and Ms. Pearce, and he claims that Ms. Pearce's testimony confirms he did not accept responsibility for approving the draw at that meeting. *See* Aplt. Br. at 42. But her testimony indicates she had no specific recollection of a meeting or even a phone call with Mr. Pace on April 15. *See* Aplt. App., Vol. 22 at 3827. However, she did testify that Mr. Seastrand "knew about the stored-materials draws and . . . he approved them." *Id.* This testimony does not create a fact issue as to whether Mr. Seastrand approved the draw. And his remaining arguments do not suggest the reason for firing him was false.

### C. Adequacy of Investigation

Next, Mr. Seastrand contends we may infer pretext because the bank terminated him without conducting an adequate investigation. *See Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) ("A failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext." (internal quotation marks omitted)). But the evidence indicates the bank thoroughly evaluated the situation before firing him. Indeed, as our recitation of the evidence demonstrates, Mr. Pace held multiple meetings involving Mr. Seastrand, Mr. Rudy, Mr. Bebel, Mr. Huppert, and others. They examined the loan documents and recreated the sequence of events to determine how the loan became distressed. Once they determined that Mr. Seastrand approved the stored-materials draw, Mr. Pace and Mr. Bebel discussed Mr. Seastrand's prior work performance and his attempt to solicit a job from the client on the Mirinda loan. And only after Mr. Pace gathered a longitudinal picture of Mr. Seastrand's

15

performance did he convene a meeting to determine whether termination was warranted for Mr. Seastrand's use of poor judgment in approving the stored-materials draw. The ultimate decision was based on the consensus of Mr. Pace, Mr. Rudy, and Mr. Bebel, who were told by Mr. Kelligrew to "do the right thing." Aplt. App, Vol. 9 at 1350.

Mr. Seastrand now contends that Mr. Pace misrepresented the facts to the other decision-makers, but nothing in his discussion of the evidence supports that assertion. *See* Aplt. Br. at 51. Rather, his discussion of the evidence confirms the bank acted on a wholly nondiscriminatory motive. *See Swackhammer*, 493 F.3d at 1169 ("[W]hen a plaintiff's evidence supports a nondiscriminatory motive for the employer's action and the plaintiff presents no evidence to undermine that motive, summary judgment for the employer is appropriate."). Although he attempts to analogize this case to *Smothers*, that case is distinguishable on its facts. In *Smothers*, the decision-makers denied the plaintiff an opportunity to explain his role in a dispute with another employee, but they obtained the other employee's version of events and "relied heavily" on it in deciding to fire the plaintiff. *Smothers*, 740 F.3d at 536-37. Here, by contrast, Mr. Seastrand was an ongoing part of the investigation and he acknowledged his role in the circumstances that led to his dismissal. Nothing about the bank's investigation suggests pretext.

### D. Additional Evidence of Discrimination

Finally, Mr. Seastrand attempts to show pretext by citing several instances of what he says were discriminatory conduct at the bank. First, he speculates that a

16

restructuring plan implemented by Mr. Rudy was actually intended to drive out "older employees in the 50s and replac[e] them with younger employees in their 30's." Aplt. Br. at 48. But the evidence demonstrates that Mr. Rudy restructured the commercial real estate group to centralize its underwriting process, which improved efficiencies and reduced costs by hiring less experienced staff to work with and learn from more experienced staff. *See* Aplt. App., Vol. 23 at 3858. And when the new, less experienced staff were hired, they did not displace existing staff, nor was there any impact on Mr. Seastrand. *See id.* at 3859. Mr. Seastrand offers no evidence to suggest otherwise.

Second, Mr. Seastrand contends that Mr. Pace had a history of engaging in discriminatory conduct. He says all seven bank employees who reported directly to Mr. Pace during his tenure have been replaced by younger, less experienced employees. The district court rejected this argument, noting it relied on a chart that indicated Mr. Pace had far more than seven employees, some of whom were excluded from the chart, which also failed to reflect that some older employees were promoted. Now, without addressing the district court's concerns, Mr. Seastrand argues that seven of Mr. Pace's employees who were 48 to 60 years old were replaced by younger employees aged 29 to 39. Yet, he only specifically identifies four: Sandra Sauer, Peter Armstrong, Karen Klerman, and Marc Wright. *See* Aplt. Br. at 48.

We have recognized that anecdotal evidence of discriminatory conduct can support an inference of pretext if the conduct "might have affected . . . decisions adverse to [the] plaintiff." *Ortiz v. Norton*, 254 F.3d 889, 896 (10th Cir. 2001).

17

However, "anecdotal evidence of discrimination should only be admitted if the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand." *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1289 (10th Cir. 2000) (internal quotation marks omitted).

Mr. Seastrand makes no attempt to establish a nexus between his dismissal and the allegations of these other employees. Indeed, he cannot because most of their grievances are predicated on events that occurred when Mr. Pace supervised Ms. Sauer, Mr. Armstrong, and Ms. Klerman at the bank's Denver office between 2008 and 2013, long before he terminated Mr. Seastrand in 2016. *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1115-16 & n.3 (10th Cir. 2007) (concluding that two-year temporal gap between distinct adverse employment actions was too long to infer pretext from statistical evidence of past adverse action). As for Mr. Wright, he was also supervised by Mr. Pace, but he was located in Seattle and had no apparent association with Mr. Seastrand. The only potential connection is that after Mr. Wright retired, Mr. Seastrand asked to apply for his job and Mr. Pace told him that another candidate had already been chosen. This missed opportunity bears no relationship with Mr. Seastrand's dismissal. And perhaps more importantly, the allegations of Mr. Wright and the other employees against Mr. Pace are all based on pure speculation as to his discriminatory motive. We have made clear that "speculation will not suffice for evidence." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1170 (10th Cir. 1998) (ellipsis and internal quotation marks omitted). We also note that Mr. Pace was not the lone decision-maker who fired Mr. Seastrand. The

18

decision was reached by consensus among Mr. Pace, Mr. Rudy, and Mr. Bebel after Mr. Seastrand acknowledged that he approved the stored-materials draw. Under these circumstances, Mr. Seastrand fails to raise an issue of fact concerning pretext.

IV

Accordingly, the judgment of the district court is affirmed.

Entered for the Court


Jerome A. Holmes
Circuit Judge