**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 21, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STEVEN SMOTHERS,

    Plaintiff - Appellant,

v.

No. 12-8013

SOLVAY CHEMICALS, INC., a
Delaware corporation,

    Defendants - Appellees.

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 2:11-CV-00200-NDF)**

Sharon M. Rose, Lavery & Rose, L.P., Evanston, Wyoming, appearing for Plaintiff-
Appellant.

Paul J. Hickey (Kristi M. Radosevich, with him on the brief), Hickey & Evans, LLP,
Cheyenne, Wyoming, appearing for Defendant-Appellee.

Before **LUCERO, McKAY,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

    Steven Smothers worked for Solvay Chemical, Inc. ("Solvay") for 18 years until

Solvay fired him, ostensibly because of a first-time safety violation and a dispute with a

coworker. Mr. Smothers contends the company's true motivations were retaliation for taking medical leave from work, in violation of the Family Medical Leave Act ("FMLA"), and discrimination on the basis of his medical disability, in violation of the Americans with Disabilities Act ("ADA").

He sued Solvay. The district court granted summary judgment for Solvay on his FMLA and ADA claims and on his state law claim for breach of implied contract. It dismissed the remaining state law claims as moot based on its resolution of Mr. Smother's breach of contract claim. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse on the FMLA and ADA claims and affirm on the state law breach of contract claim.

## I. **BACKGROUND**

### A. *Factual History*

Because this case arises from an appeal of summary judgment, we present "the evidence, and draw reasonable inferences therefrom, in the light most favorable to" Mr. Smothers as the non-moving party. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1167 n.2 (10th Cir. 2006).

1. **Mr. Smothers' work and medical history**

Mr. Smothers was a surface maintenance mechanic in Solvay's trona mine[1] in Sweetwater County, Wyoming, from 1990 until August 27, 2008.[2]

---

[1] "Trona is a relatively rare sodium-rich mineral" that is mined and processed into soda ash. *Barlow & Haun, Inc. v. United States*, 87 Fed. Cl. 428, 431 (2009) (quotations omitted). It is used in paper manufacturing and water treatment and is an ingredient in

Continued . . .

Mr. Smothers injured his neck in 1994 and developed a degenerative disc disease in his spine. His medical condition remained serious, requiring three surgeries to his neck between 1999 and 2004, as well as numerous other medical procedures. This caused severe ongoing pain, including chronic neck pain, severe migraine headaches, and lower back problems. For several years, Mr. Smothers traveled to Salt Lake City for medical appointments with a specialist. In medical records from these visits, Mr. Smothers' treating physician repeatedly noted that his pain continued and even increased in spite of various medical treatments, causing him to "miss[] a lot of work" and to be "quite miserable." Aplt. Appx., Vol. II at 543. At times the pain was so severe that Mr. Smothers "would basically be unable to work" without pain treatments. *Id.* at 549.

Pain also affected Mr. Smothers' sleep. He was often able to sleep only four hours a night, though he sometimes reported sleeping as many as six hours. Mr. Smothers consistently reported being awakened by his pain four to six times each night. His surgeries and various other medical treatments, including prescriptions for pain, failed to resolve his difficulty sleeping. His doctor prescribed various sleeping aids, which also failed to fully resolve his sleep problems.

---

Cont.

baking soda and detergents. *Id.* Sweetwater County contains "the largest known deposit of trona" and "accounts for approximately 30% of the total global production and 90% of total domestic soda ash production." *Id.*

[2] Mr. Smothers' employment began with Solvay's corporate predecessor, Tenneco.

Mr. Smothers sought and was granted FMLA leave from Solvay for intermittent absences caused by this condition. Solvay considered him an excellent mechanic with strong job knowledge who "always [did] top knotch work [sic] . . . always [got] along with everyone," took "pride in his work ethics and [was] always very reliable." Aplt. Appx., Vol. II at 508-09, 493. But managers and coworkers complained about his FMLA-protected absences. Production Superintendent Melvin Wallendorff pressured him to change from his graveyard shift to a day shift, where a larger staff could more easily absorb his absences without requiring the company to incur overtime costs. This shift change would have reduced Mr. Smothers' income by about $7,000 a year. A Human Resources representative advised Mr. Wallendorff that forcing Mr. Smothers to make the change would violate FMLA. Mr. Wallendorff relented, but he and others continued to complain about Mr. Smothers' absences.

Mr. Wallendorff and Rick Wehrle, Mr. Smothers' direct supervisor, gave Mr. Smothers a negative rating on his performance evaluation because of his absenteeism. Sometime in 2005 or 2006, Mr. Smothers applied for a promotion and was told he was being rejected because of his absences. Mr. Smothers did not raise any FMLA challenge or complaint about the lost promotion.

2. **The hydrochloric acid leak incident**

Hydrochloric acid is a dangerous but widely-used commercial chemical that may harm humans if it is inhaled or ingested or touches the skin or the eyes. About every six

months, the Solvay plant uses hydrochloric acid to remove build up inside its equipment through an "acid wash" process, which takes 24 hours. Aplt. Appx., Vol. II at 399.

The Solvay graveyard crew was conducting an acid wash on August 19, 2008. At about 1:00 a.m., Control Board Operator Shane Youngburg recognized a problem with the acid flow. He remotely shut down the acid pump and notified Plant Operator Charles Brown.[3] Mr. Brown investigated and found a rupture in a "line"—i.e., a plastic pipe—running between an acid tank and a pump that transferred the acid into the plant. Acid was "spraying out" from the ruptured line into the surrounding containment area—a pit enclosed by a six-foot concrete wall. *Id.*

Mr. Brown donned protective gear and began a four-hour clean-up process, draining several inches of acid from the bottom of the containment area and using a fire hose to wash away the remaining acid. When it was safe to do so, Mr. Brown entered the containment area and closed the suction valve to stop the flow of acid, which involved physically turning a wheel about the size of a steering wheel. He "thorough[ly]" cleaned the valves and equipment and confirmed that no acid was flowing from the broken line. *Id.* at 401. Lead Foreman Alex Loredo was present and assisted during part of the clean-up process.

Around this time, Mr. Brown and Mr. Loredo notified Mr. Smothers that "they were going to get a line break permit and a lock out" and that the pump was "ready to be

---

[3] Mr. Brown's testimony is unclear as to when the pump was shut down, but it is clear the pump was off by the time Mr. Smothers arrived in the area.

worked on." *Id.* at 311. The "line break" permit or form referred to a Solvay safety policy requiring employees to obtain formal clearance before "breaking"—i.e., disconnecting or otherwise opening—a line containing hot water, pressure, or any chemical. Aplt. Appx., Vol. II at 497-98; *id.* Vol. I at 236. The permit certifies that employees have completed a checklist of precautions that are necessary before a line can be safely disconnected. Checklist items include ensuring the employees involved have sufficient training and safety equipment, that all equipment is de-energized, and that any valves are closed. The checklist also includes a "lock out" procedure, in which an employee places physical locks and/or chains on all valves and equipment to prevent them from opening or re-energizing. *Id.* Vol. II at 498; *id.* Vol. I at 236.

Mr. Smothers approached the acid tank and saw that a damaged suction flange or "spool piece" connected to the acid pump had caused the problem. Aplt. Br. at 8. Mr. Smothers prepared to remove the spool piece when Dan Mahaffey, another mechanic working nearby on a different repair, suggested that Mr. Smothers should wait for a line break permit. Mr. Smothers disagreed, saying the line break permit was not required because the line was already broken. Mr. Mahaffey said "fine" and left. Aplt. Appx., Vol. II at 531.

Mr. Smothers then removed the broken spool piece and took it to the maintenance shop to repair it. Although doing this did not necessarily violate Solvay's *line break* policy, Mr. Smothers now concedes that removing the spool piece before completing the lock out—i.e., placing a physical lock on the pump valve—was still a violation of

-6-

Solvay's safety policies. *Id.* at 463; *see also* Aplt. Br. at 8.

When Mr. Smothers went to the maintenance shop, Mr. Mahaffey sought out Mr. Brown to tell him about the disagreement with Mr. Smothers regarding the necessity of a line break permit. Mr. Loredo heard this and intervened by authorizing a line break permit. By this time, Mr. Brown had completed all or most of the lock out procedure. Mr. Loredo radioed Mr. Smothers to tell him the line break permit was on its way and told him to put his own lock on the pump valve before replacing the spool piece.

Mr. Mahaffey then went to the maintenance shop and offered to assist, but Mr. Smothers refused his help. Mr. Mahaffey took offense and accused Mr. Smothers of hypocrisy because Mr. Smothers had previously reported other employees for safety violations. According to Solvay, Mr. Smothers told Mr. Mahaffey, "I don't want your kind of help" and said he was "going to take a shit and wanted to know if [Mahaffey] wanted to watch him to see if he did that right." Aplt. Appx., Vol. II at 531. Mr. Smothers described the interaction differently, asserting that Mr. Mahaffey provoked the argument and began yelling and ranting at him. Other witnesses in the shop at the time characterized the interaction as Mr. Smothers and Mr. Mahaffey "arguing," *id.* at 512, or "yelling at each other," *id.* at 500, or as the men having "a confrontation," *id.* at 518.

At 5:00 a.m., Mr. Brown handed Mr. Smothers the line break permit. Mr. Smothers finished repairing the spool piece. At about 6:00 a.m., he returned to the containment area and placed his lock on the pump valve. Sometime between 6:40 and 6:45 a.m., Mr. Smothers installed the repaired spool piece, a process that took about ten

-7-

minutes.

### 3. The investigation and termination

Area Supervisor Erik Zimmerman arrived at work that morning between 5:00 and 6:00 a.m., and immediately received a call from Mr. Mahaffey, who wanted to make a complaint about Mr. Smothers concerning the argument and Mr. Smothers' removing the spool piece without a line break permit. After he wrote up this complaint, Mr. Zimmerman spoke with Mr. Smothers and drafted a summary of their conversation.

Mr. Smothers acknowledged removing the spool piece before locking the pump valve, saying he thought that was permissible because he could see the valve to confirm it was closed and the line was already disconnected. Mr. Zimmerman agreed that a line break permit might not have been required. But he expressed concern that Mr. Smothers removed the spool piece before doing a lock out. Mr. Smothers told Mr. Zimmerman that Mr. Mahaffey had come into the maintenance shop "yelling" and "ranting" at him. Aplt. Appx., Vol. I at 134. Mr. Zimmerman did not tell Mr. Smothers about Mr. Mahaffey's version of the events or ask Mr. Smothers whether he actually made the statements Mr. Mahaffey alleged.

That same morning, three managers—Mr. Zimmerman, Safety Manager Rowdy Heiser, and Maintenance Superintendent Jim Holley—called Mr. Smothers into a meeting. Mr. Smothers arrived and tried to explain his version of the exchange with Mr. Mahaffey, but Mr. Holley stopped him and said the managers were not interested in hearing about the argument. Aplt. Appx., Vol. II at 421-22. They discussed the safety

violation. Mr. Smothers explained what he had done and apologized for not locking the pump valve before removing the spool piece. He promised it would not happen again. Mr. Holley sent Mr. Smothers home pending an investigation.

While Mr. Smothers was effectively suspended, Solvay continued its investigation. Mr. Zimmerman visited Mr. Mahaffey's home to obtain a more detailed statement of Mr. Mahaffey's version of the quarrel. Mr. Zimmerman did not make a similar effort to contact Mr. Smothers for a more detailed statement of his version of events. During this time, Mr. Smothers sent two emails to Solvay managers saying he was "very worried that Solvay [was] going to use this incident as a reason to terminate my employment due to the amount of time I have missed due to my disability." *Id.* Vol. I at 106.

On August 27, 2008, Solvay told Mr. Smothers he was fired, the product of a group decision by six managers ("decision makers," or collectively, the "decision-making group"). Site Manager Ron Hughes was the ultimate decision maker. The other five managers in the decision-making group included Surface Operations Manager Todd Brichacek, Human Resources Manager Jim Maxfield, Mr. Holley (Maintenance Superintendent), Mr. Heiser (Safety Manager), and Mr. Wallendorff (Production Superintendent).[4]

---

[4] According to Mr. Smothers, Mr. Zimmerman participated in the investigation but was not part of the ultimate decision-making group. The record is inconsistent as to

Continued . . .

Before making their final decision, at least three decision makers—Mr. Heiser, Mr. Holley, and Mr. Brichacek—personally talked with Mr. Mahaffey about his argument with Mr. Smothers. No one from the decision-making group spoke with Mr. Smothers about his version of the argument.[5]

Five of the six decision makers testified that the argument with Mr. Mahaffey weighed heavily in the group's decision to fire Mr. Smothers.[6] Mr. Hughes said that Mr. Smothers' role in the argument, particularly the alleged "restroom" comment, demonstrated a "defiant attitude and hostile behavior" that warranted termination. Aplt. Appx., Vol. II at 431, 429. Mr. Brichacek and Mr. Wallendorff also testified that the group relied heavily on Mr. Mahaffey's allegations—including Mr. Mahaffey's characterizations of Mr. Smothers' behavior—in deciding what discipline was appropriate.

_____

Cont.

whether Mr. Zimmerman was a decision maker. To the extent this fact is material and disputed, we accept Mr. Smothers' version.

[5] As noted above, Mr. Zimmerman did speak with Mr. Smothers about the argument on one occasion, on the morning of the event. Mr. Zimmerman spoke with Mr. Mahaffey multiple times, including the morning of the event and later when he went to Mr. Mahaffey's home.

[6] Only one member of the decision-making group, Mr. Holley, testified that Mr. Smothers was fired solely because of the safety violation and that the argument played no role in the termination decision.

-10-

4. **Solvay's disciplinary decisions after similar violations**

Mr. Smothers points to evidence of other employees who were treated more favorably after committing serious safety violations.

Two foremen, referred to as Mr. C and Mr. D, deliberately violated the lock out policy by prying open a lock box to remove a key, then energizing equipment while work was being done on it. The decision-making group in that instance included Mr. Hughes, Mr. Brichacek, Mr. Holley, Mr. Wallendorff, and Mr. Maxfield. The group chose not to terminate because the two foremen had taken at least some safety precautions, had apologized, and had promised not to make the same mistake again.

On other occasions, employees who violated Solvay's safety policies were not terminated. For example, a surface hourly worker who violated the lock out policy and narrowly avoided serious injury received only a warning from Mr. Holley and Mr. Hughes. [*Id.* at 435-36, 636-38] Additionally, Solvay knew that Mr. Holley violated safety policies on at least one occasion when his direct supervisor, Mr. Brichacek, received reports from multiple employees, including Mr. Smothers, that Mr. Holley had arrived at work under the influence of alcohol. Mr. Holley was not disciplined. [*Id.* at 474, 485]

B. *Procedural History*

Mr. Smothers filed a complaint in the United States District Court for the District of Wyoming, asserting six causes of action. He appeals from the district court's grant of summary judgment to Solvay on three claims: (1) unlawful retaliation for exercising his

rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615; (2) unlawful discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112; and (3) breach of implied employment contract under Wyoming law.[7]

## II. **DISCUSSION**

### A. *Standard of Review*

We review summary judgment determinations de novo, applying the same standard as the district court. *See Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009). We view facts in the light most favorable to Mr. Smothers as the non-moving party and "draw all reasonable inferences" in his favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). When evaluating an employer's motives or reasons, "motivation is itself a factual question." *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).

"Summary judgment is appropriate only if [Solvay] shows 'there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law.'" *Tabor*,

---

[7] The remaining three causes of action arose under state law and included various claims for negligent and fraudulent misrepresentation and non-disclosure. Mr. Smothers does not appeal the dismissal of these claims. After granting summary judgment on the first three claims, the district court dismissed the remaining claims as moot. Mr. Smothers does not challenge the dismissal of the latter three claims.

703 F.3d at 1215 (quoting *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir.2012)); *see also* Fed. R. Civ. P. 56(a).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Tabor*, 703 F.3d at 1215 (quotations omitted).

## B.  *The McDonnell-Douglas Framework*

This circuit analyzes employment-related claims based on circumstantial evidence under the "analytical framework first articulated in *McDonnell-Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]."  *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1217 (10th Cir. 2010); *see also Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (*McDonnell-Douglas* framework applies to ADA discrimination and FMLA retaliation claims).[8]

The *McDonnell-Douglas* framework involves three steps:  (1) the plaintiff must establish a prima facie case of discrimination or retaliation; (2) the defendant employer must offer a legitimate non-discriminatory reason for the adverse employment action; and (3) the plaintiff must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual.  *See MacKenzie v.*

---

[8] *McDonnell-Douglas* does not apply when the plaintiff presents direct evidence that an employer discriminated on the basis of a protected characteristic, like disability. *See Tabor*, 703 F.3d at 1216.  Mr. Smothers does not challenge the application of *McDonnell-Douglas* in his case.  Although he presented evidence that Solvay previously attempted to undermine his employment position because of absenteeism related to his disability, he does not contend that this is direct evidence of discrimination on the basis of disability.

*City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).

### 1. **Step 1: The prima facie case**

The particular elements a plaintiff must meet to establish a prima facie case depend upon the claim. In this case, Mr. Smothers must satisfy different elements for his FMLA and ADA claims, which we describe in our separate discussions of each claim.

The plaintiff's burden at the prima facie stage requires only a "small amount of proof necessary to create an inference" of discrimination or retaliation, *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005), by "a preponderance of the evidence," *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). This burden is "'not onerous.'" *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1197 (quoting *Texas Dep't of Cmty .Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Tabor*, 703 F.3d at 1216 n.4 (prima facie burden is "slight"); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004) (prima facie burden is "relatively lax").

### 2. **Step 2: Legitimate, non-discriminatory reason**

If the plaintiff successfully establishes a prima facie case, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1191. "The defendant's burden at this stage is one of production, not one of persuasion." *Id.*

### 3. **Step 3: Pretext**

Once the first two steps are satisfied, the burden shifts back to the plaintiff to demonstrate that the employer's justification is pretextual. "[A] plaintiff demonstrates

pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007).

Evidence of pretext may take any number of forms, including evidence the plaintiff "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). An employer's purported reason may also be undermined by evidence the company failed to adequately investigate the offense for which it purportedly fired the plaintiff. *See Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159 (10th Cir. 2008); *see also Kendrick*, 220 F.3d at 1231-32.

### C. *Analysis of Claims*

We begin with Mr. Smothers' FMLA claim and conclude that Solvay is not entitled to summary judgment because Mr. Smothers presented a genuine dispute of material fact as to whether Solvay's stated purpose for firing him was pretextual. Next, we address Mr. Smothers' ADA claim and conclude that Solvay is not entitled to summary judgment because he met his prima facie burden and demonstrated a genuine fact issue as to pretext. Finally, we turn to Mr. Smothers' state law breach of implied employment contract claim and conclude that Solvay is entitled to summary judgment because Mr. Smothers failed to show a genuine dispute of fact as to whether Solvay violated the terms of its employee handbook.

1. ***The FMLA Claim***

"The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave, without fear of termination . . . [for] 'a serious health condition.'" *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007) (quoting 29 U.S.C. § 2612(a)(1)(D)). It is unlawful for an employer to retaliate against an employee for taking FMLA leave. 29 U.S.C. § 2615(a)(2); *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012); *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007).

To establish a prima facie case of retaliation under the FMLA, Mr. Smothers must show (1) he engaged in a protected activity by taking FMLA-protected leave; (2) Solvay took a materially adverse action against him; and (3) the circumstances permit an inference of causal connection between the two events, in this case based on temporal proximity. *See Khalik*, 671 F.3d at 1193; *Metzler*, 464 F.3d at 1171. The district court held that Mr. Smothers met this burden.[9] It also concluded that Solvay met its burden to proffer a legitimate, non-discriminatory reason for firing him. The parties do not challenge these conclusions on the first two *McDonnell-Douglas* steps.

This FMLA claim turns on the third *McDonnell-Douglas* step—pretext. The

---

[9] The district court also analyzed whether Mr. Smothers had stated separate prima facie claims of FMLA retaliation based on three additional employment actions, including verbal chastisements, a negative performance evaluation, and a promotion he was denied. The court rejected each of these purported claims at the prima facie step. On appeal, Mr. Smothers argues that the district court nevertheless should have considered these events as background facts in support of his core FMLA retaliation claim for his termination.

district court held that Mr. Smothers "failed to demonstrate a triable issue of fact" as to whether Solvay's reasons for firing him were pretextual.  Aplt. Appx., Vol. II at 595.  We disagree.

The evidence viewed in Mr. Smothers' favor shows that:  (1) Solvay treated Mr. Smothers differently from similarly situated employees who committed comparable safety violations; (2) Solvay's investigation into Mr. Smothers' quarrel with Mr. Mahaffey was inadequate; and (3) Solvay managers previously took negative action against Mr. Smothers because of his FMLA-protected absences.  Together these grounds create a triable issue of fact as to whether Mr. Smothers' FMLA leave was a substantial motivation in Solvay's decision to fire him.

1. **Disparate treatment for similarly situated employees**

"A plaintiff may . . . show pretext . . . by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232.  Mr. Smothers points to other employees who committed similar safety violations yet were not fired.  Solvay argues these employees were not similarly situated because (a) Mr. Smothers has not proven that the violations involved the same decision makers, and (b) Mr. Smothers' safety violation was worse than the others.

a.  *Same decision makers*

To be "similarly situated" to the plaintiff, the other employee must "share the same supervisor" or decision maker.  *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los*

-17-

*Angeles*, 450 F.3d 476, 489 (10th Cir. 2006).  This is because different treatment by itself does not always indicate pretext.  Differences in disciplinary decisions "may be explained by the fact that the discipline was administered by different supervisors, or that the events occurred at different times when the company's attitudes toward certain infractions were different."  *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1320 (10th Cir.1992) (quotations and citations omitted).

Solvay uses group decision making to discipline for safety violations and argues that the composition of the group that fired Mr. Smothers was different from the composition of the groups that disciplined the other employees Mr. Smothers identified. The facts do not bear this out.

Five of the six decision makers who fired Mr. Smothers also participated in at least one decision in which a similarly situated employee was treated more favorably after violating the same or comparable safety rules.  Mr. Hughes, Mr. Brichacek, Mr. Holley, and Mr. Maxfield chose not to fire Mr. C and Mr. D, the two foremen who violated the lock out policy.  Mr. Hughes and Mr. Holley also chose not to fire a surface hourly worker who violated the lock out policy.  Finally, Mr. Brichacek chose not to discipline Mr. Holley for the presumably serious safety violation of being under the influence of alcohol while at work.

Although there is no clear legal rule as to how much overlap is needed among decision maker *groups* for employees to be similarly situated, requiring absolute congruence would too easily enable employers to evade liability for violation of federal

employment laws. The district court erroneously rejected Mr. Smothers' pretext argument by insisting that the composition of the decision maker groups be precisely the same in every relevant disciplinary decision. We disagree because there is more than enough overlap to conclude the employees identified here were similarly situated to Mr. Smothers.[10]

b. *Comparable offenses*

"[E]mployees who are similarly situated must have been disciplined for conduct of comparable seriousness in order for their disparate discipline treatment to be relevant." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (quotations omitted). When comparing different treatment of similarly-situated employees, "the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness." *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) (quotations omitted).

Solvay contends that Mr. Smothers' offense was worse than the other employees' offenses because he acted deliberately and violated a clear policy.[11] But the record

---

[10] Additionally, it is undisputed that Mr. Hughes was the ultimate decision maker in all discipline cases. The record indicates he played an active role in these disciplinary decisions and his involvement extended beyond mere pro forma approval. Nevertheless, our conclusion does not rest solely on Mr. Hughes's role because he was many levels removed from Mr. Smothers' direct supervisor.

[11] Solvay insists that Mr. Smothers violated both the line break policy and the lock out procedure. Testimony from several managers indicates the line break policy did not

Continued . . .

indicates other employees also deliberately violated clear policies. For example, foremen Mr. C and Mr. D acted deliberately when they broke into a lock box and energized equipment while it was being worked on. Solvay says it did not fire Mr. C or Mr. D because they took at least some safety precautions, apologized, and promised not to repeat the mistake. But Mr. Smothers also apologized and promised not to repeat the mistake. Moreover, Mr. Smothers also took precautions by ensuring the valve was closed. Solvay also emphasizes that Mr. Smothers had been trained on the safety rules. But the record indicates Solvay required every employee to complete the same safety training. Drawing reasonable inferences in Mr. Smothers' favor, the evidence shows Mr. Smothers and the similarly situated employees he identified all received the same training.

In short, Mr. Smothers has established a genuine and material factual issue as to whether he was punished more harshly than similarly situated employees after comparable safety violations. A reasonable jury could therefore infer that the safety violation was pretext for unlawful retaliation. *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1198 ("[D]ifferential treatment of similarly-situated employees may support a finding of pretext." (emphasis omitted)).

Solvay responds that, unlike these other employees, Mr. Smothers' offense

---

Cont.

clearly apply to an already broken line, but Mr. Smothers acknowledges that he violated the lock out procedure by removing the spool piece before placing a lock on the pump.

extended beyond the safety violation to his quarrel with Mr. Mahaffey.  Mr. Smothers'

behavior toward Mr. Mahaffey might have been relevant.  But as we discuss next, a jury

could still reasonably infer pretext because Solvay did not adequately investigate the

quarrel that purportedly drove its decision.

2.  **Insufficient investigation into the co-worker quarrel**

A "failure to conduct what appeared to be a fair investigation of" the violation that

purportedly prompted adverse action may support an inference of pretext.  *Trujillo*, 524

F.3d at 1160; *cf. BCI Coca-Cola Bottling Co.*, 450 F.3d at 488 (Employer may "defeat

the inference that an employment decision was" a product of reliance on a biased

subordinate by "simply asking an employee for his version of events," and not "rely[ing]

exclusively on the say-so of the biased subordinate").

Managers in the decision-making group said Mr. Smothers was fired because his

quarrel with Mr. Mahaffey showed he had been "defiant," "hostile," and "aggressive."

Aplt. Appx., Vol. II at 429.  But Mr. Smothers emphatically disputes these

characterizations, and the same managers acknowledge their beliefs were based almost

entirely on Mr. Mahaffey's version of events.  Three decision makers personally spoke

with Mr. Mahaffey to hear his allegations regarding Mr. Smothers' behavior.  None heard

Mr. Smothers' version of the encounter.  During the only meeting Mr. Smothers had with

any decision maker, Mr. Holley even refused to allow him to talk about the quarrel.  Aplt.

Appx., Vol. II at 421-22.

Solvay notes that the decision makers read Mr. Zimmerman's summary of his

-21-

conversation with Mr. Smothers, which included several sentences about the quarrel.

But simply reading this summary did not make the investigation fair or adequate. Mr. Zimmerman did not tell Mr. Smothers about Mr. Mahaffey's allegations, nor did he give Mr. Smothers a chance to explain or deny those allegations. *See* Aplt. Appx., Vol. II at 501-03, 516-18.[12] The decision makers ultimately relied on one-sided information and accepted Mr. Mahaffey's allegations and negative characterizations of Mr. Smothers' behavior.[13]

---

[12] As noted above, Mr. Zimmerman even traveled to Mr. Mahaffey's home to collect additional detail about Mr. Mahaffey's version of events. He did not make similar efforts to learn Mr. Smothers' version.

[13] In rejecting Mr. Smothers' pretext argument, the district court relied heavily on its findings that Mr. Mahaffey "told [Mr. Smothers] twice what to do" and that Mr. Smothers refused to follow these purported instructions. Aplt. Br. at 28. This refers to two interactions: (1) before Mr. Smothers removed the spool piece from the broken line, Mr. Mahaffey suggested he needed a line break permit; and (2) Mr. Mahaffey later went to the maintenance shop and offered to help, which the district court took to be a second instruction.

The district court's finding improperly resolved disputed facts and inferences in Solvay's favor and ignored fatal problems with Solvay's inadequate, one-sided investigation. Under Mr. Smothers' version of events—which decision makers did not hear—neither interaction would be characterized as an instruction. Mr. Mahaffey's first statement seemed more like a suggestion from a colleague about how best to proceed. Moreover, Mr. Mahaffey and Mr. Smothers held the same position, and there is no evidence Mr. Mahaffey had authority over Mr. Smothers. Solvay does not explain why failing to comply with a peer's "instruction" would have transformed an ordinary safety violation—like those committed by similarly situated employees—into a terminable offense.

As for the second purported instruction, under Mr. Smothers' version of events, this interaction seemed to be a mutual, personal disagreement between peers based on events that had already happened, such as their earlier difference of opinion about the line break permit and Mr. Smothers' history of reporting others for safety violations. By the

Continued . . .

If Solvay's decision makers had allowed Mr. Smothers to respond to Mr. Mahaffey's allegations before they fired him, we could perhaps accept that Solvay found Mr. Mahaffey's version of events more credible. But we must "examine the facts as they appear to the [people] making the decision." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011) (quotations omitted) (emphasis omitted). To that end, the record suggests that Solvay's decision makers deliberately prevented Mr. Smothers from defending his actions with respect to the quarrel and consequently reached their conclusions about what transpired based on one-sided information—then fired Mr. Smothers based largely on those tenuous conclusions.

In sum, a reasonable jury could find that Solvay's investigation into the quarrel between Mr. Smothers and Mr. Mahaffey was not fair or adequate. This inadequate investigation and Solvay's disparate treatment of similarly situated employees who violated comparable safety rules would allow a reasonable jury to conclude that Solvay's purported reason for firing Mr. Smothers was pretextual.

3. **Evidence of previous retaliatory acts**

Our conclusion that Mr. Smothers demonstrated a triable fact issue concerning

---

Cont.

time this second interaction occurred, Mr. Smothers had already removed the spool piece. And it is undisputed that the line break permit and the lock out procedure were completed before Mr. Smothers installed the repaired spool piece. Thus, even if this second interaction were a genuine instruction to secure a line break permit before completing the repair, it is not clear how Mr. Smothers failed to comply.

-23-

pretext finds further support in the evidence of Solvay's negative comments and actions concerning his FMLA-protected absences. Mr. Smothers argues that these previous actions demonstrate bias and support the inference that Solvay used the safety violation as pretext to fire him.

The district court held that these past events could not support independent FMLA claims because they did not alter Mr. Smothers' job status and therefore were not serious enough to be materially adverse employment actions.[14] Solvay mistakenly argues that the district court's holding makes these facts irrelevant. Even when an incident of alleged employer discrimination or retaliation does not support an independent retaliation claim, it may be relevant as background evidence in a pretext inquiry. *See Nat'l Ry. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Croy v. Cobe Labs, Inc.*, 345 F.3d 1199, 1203 (10th Cir. 2003).

In depositions, Solvay managers acknowledged that managers and co-workers had long complained about Mr. Smothers' FMLA-protected absences. Mr. Smothers presented evidence that Solvay refused to promote him and gave him negative ratings on his recent performance evaluations expressly because of his FMLA-protected absences. Additionally, Mr. Wallendorff admitted that he tried to force Mr. Smothers to change shifts until Human Resources advised him this would be unlawful. Aplt. Appx., Vol. II at

---

[14] The district court also concluded that the statute of limitations had likely run on any claim based on Solvay's refusal to promote him based on his FMLA-protected absences.

478-79. Although Mr. Wallendorff did not ultimately follow through with the forced shift change, he testified that he and others remained openly frustrated with Mr. Smothers' absences. They repeatedly asked senior managers and Human Resources if there was "something else [they could] do." *Id.* at 479.

This background evidence lends further support to the inference that Solvay was frustrated with Mr. Smothers' use of FMLA leave and seized upon his safety violation and quarrel with Mr. Mahaffey as a pretext to fire him and avoid the inconvenience caused by his FMLA-protected absences.

\*       \*       \*

For these reasons, we conclude Mr. Smothers has established a genuine issue of material fact as to whether Solvay's stated reasons for firing him were pretextual. We therefore reverse the district court's grant of summary judgment on Mr. Smothers' FLMA claim.

2. *ADA Claim*

The district court rejected Mr. Smothers' ADA claim on two grounds: (1) Mr. Smothers failed to make out a prima facie case because he was not disabled within the meaning of the ADA; and alternatively, (2) he failed to demonstrate pretext. The district court erred on both grounds.

a. *The prima facie case*

"Congress enacted the [Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*,] in 1990 to remedy widespread discrimination against" persons with

disabilities.  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001).  To establish a prima facie case of employment discrimination under the ADA, Mr. Smothers must present evidence that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without accommodations; and (3) he was terminated "under circumstances which give rise to an inference that the termination was based on [his] disability."  *Morgan*, 108 F.3d at 1324; *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999).  Solvay does not challenge the second or third prima facie element.

As for the first element, Congress provided three statutory definitions for "disability" under the ADA:  A plaintiff may show either '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'"  *Johnson*, 594 F.3d at 1218 (quoting 42 U.S.C. § 12102(1)).  At the district court, Mr. Smothers argued that he satisfied both (A) and (C).  In its summary judgment motion, Solvay challenged (C) but made no argument regarding (A).  Mr. Smothers understood this as a concession as to (A) and therefore did not argue the issue in his opposition to summary judgment.  The district court nonetheless concluded that Mr. Smothers had not satisfied either (A) or (C).  On appeal, Mr. Smothers argues that the district court should not have addressed (A) because it was uncontested.

After careful review of Solvay's summary judgment materials, we find little to indicate that Solvay contested Mr. Smothers' disability qualification under subsection

-26-

(A).  The district court nevertheless chose to consider the question.  We think Solvay

came perilously close to waiving its arguments on this issue.[15]

But even if Solvay's arguments are not waived, they fail.  As noted above, Mr.

Smothers' burden at the prima facie stage is "not onerous," and his medical records

provide sufficient evidence to satisfy this burden.  *Horizon/CMS Healthcare Corp.*, 220

F.3d at 1197 (quoting *Burdine*, 450 U.S. at 253).  To demonstrate disability for purposes

of an ADA claim under subsection (A), Mr. Smothers must show:  (1) he has an

impairment that (2) substantially limits (3) a major life activity.  *Doyal v. Okla. Heart,

Inc.*, 213 F.3d 492, 495 (10th Cir. 2000).[16]  Mr. Smothers asserts that (1) his neck and

back condition and the associated pain he experiences (2) substantially limits his ability

to perform (3) several major life activities, including sleeping.  Solvay does not contest

the first requirement.  The third requirement is a question of law, which Mr. Smothers

---

[15] In its brief, Solvay urges us to affirm the district court's holding that Mr. Smothers was not disabled under the ADA.  But at oral argument, Solvay conceded that its summary judgment arguments focused on the pretext issue without clearly contesting Mr. Smothers' disability under subsection (A).

[16] Congress amended this standard in the ADA Amendments Act of 2008 with the express purpose of reversing the narrow judicial interpretation of disability articulated in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and other cases.  The statute stated that prior court interpretations of the ADA had not conformed to the congressional intent. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553.  The Amendments Act created a broader definition of disability to protect more individuals, by, inter alia, expanding what is considered a major life activity and directing courts to interpret "substantial limitation" broadly in favor of coverage.  *See id.*

We apply the older, narrow judicial rule in Mr. Smothers' case because he was fired before the ADA Amendments Act of 2008 became effective.  *See Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1144 (10th Cir. 2011) (ADA Amendments Act not retroactive).

satisfies. *See Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) ("We hold that sleeping is a major life activity under the ADA."). Mr. Smothers' prima facie case therefore turns on the second requirement, which is a question of fact. *See Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (substantial limitation is "a question of fact for the jury"); *see also Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).

To survive summary judgment, Mr. Smothers must show that a reasonable jury could find that his medical condition *substantially* limited his ability to sleep. His limitation was substantial if he was "significantly restricted as to the condition, manner or duration" of sleep "as compared to . . . the average person." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216-17 (10th Cir. 2007) (quotations omitted). "Factors to be considered are: 'the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(2)); *see also Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir. 1994) ("We are guided by the definition found in [EEOC regulations].").

The record shows that Mr. Smothers' medical condition required multiple surgeries over several years. *See* Aplt. Appx., Vol. II at 532-72. Numerous medical treatments failed to resolve his condition or eliminate his severe pain. Medical records for more than a dozen medical visits between June 2006 and September 2008 show that

Mr. Smothers consistently complained of an inability to sleep.[17] He consistently reported

waking between four and six times each night because of his pain and being able to sleep

only four or six hours a night—in spite of multiple prescription pain medications and

various prescription sleep aids. *See id.*[18]

These facts would allow a reasonable jury to conclude that Mr. Smothers' sleep

was substantially limited, which satisfies the first prima facie element to show that he has

a disability within the meaning of the ADA. Because the other prima facie elements are

not challenged, we therefore conclude that Mr. Smothers satisfied his prima facie burden.

   b. *Pretext analysis*

In our analysis of Mr. Smothers' FMLA claim, we determined Mr. Smothers has

---

[17] We previously have held in other cases that certain sleeping difficulties do not give rise to an inference of disability. But plaintiffs in those cases failed to produce evidence about the duration or severity of their impairments. *See Johnson v. Weld Cnty.*, 594 F.3d 1202, 1218 n.10 (10th Cir. 2010) (lack of record evidence prevented disability determination based on plaintiff's difficulty sleeping); *Humbles v. Principi*, 141 F. App'x 709, 712 (10th Cir. 2005) (unpublished) (plaintiff who claimed to get four to five hours of sleep per night "failed to present any evidence" of substantial limitation). Mr. Smothers' documented medical history shows his sleeping issues have been virtually intractable and limiting for years despite numerous treatment efforts. A jury could therefore reasonably conclude that his impairment is sufficiently permanent or long term to qualify as a disability.

[18] As noted above, the older, narrow judicial rule governing the definition of disability applies in this case. Under this older rule, if an "impairment is corrected by mitigating measures . . . it does not substantially limit a major life activity." *Sutton*, 527 U.S. at 483 (quotations omitted). In this case, Mr. Smothers' medical records include evidence of "mitigating measures," in the form of prescription sleep aids, pain medication, surgeries, and other medical treatments. But the records do not indicate these measures corrected his impairment or resolved his sleeping problems. Mr. Smothers experienced consistent problems sleeping even after taking these mitigating measures.

demonstrated a genuine issue of material fact whether Solvay's stated reasons for firing him—the safety violation and quarrel with Mr. Mahaffey—were pretextual. When a plaintiff demonstrates that an employer's proffered reasons are "unworthy of credence," a jury may "infer the ultimate fact of discrimination" or retaliation. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007). Thus, the showing of pretext for purposes of the FMLA claim extends to the ADA claim.

\* \* \*

We therefore reverse the district court's grant of summary judgment on the ADA claim.

3. ***State Law Claim***

The district court rejected Mr. Smothers' state law claim for breach of an implied employment contract, concluding there was no genuine issue of material fact as to whether Solvay had violated the terms of its employee handbook. We affirm because Mr. Smothers has not shown that a reasonable jury could conclude that Solvay violated the terms of its handbook when it terminated him.

Under Wyoming law, breach of an implied employment contract arises if an employer fails to follow its own required procedures or fires an employee without cause. *Lifecare Centers of America, Inc. v. Dexter*, 65 P.3d 385, 391 (Wyo. 2003). An employee handbook may provide the basis for the terms of an implied employment contract. *Id.* Wyoming law allows immediate termination for serious offenses when expressly permitted by the employee handbook. *Burbank v. Wyodak Res. Dev. Corp.*, 11

-30-

P.3d 943, 947-48 (Wyo. 2000).

When Mr. Smothers began employment with Solvay's predecessor in 1990, the company provided him with an employee handbook outlining workplace policies and disciplinary procedures ("the Handbook"). The district court concluded that the Handbook was an implied employment contract, and Solvay does not challenge this holding. The Handbook contained a four-step progressive disciplinary process, with termination as a last resort. But it also contained a provision allowing Solvay to terminate an employee immediately for a serious offense, including a safety violation. See Aplt. Appx., Vol. I at 79.

When determining whether an employer followed its own procedures, a court should ask whether "the factual basis on which the employer concluded [the employee committed an offense] was reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual[.]" *Sheaffer v. State ex rel. University of Wyo.*, 202 P.3d 1030, 1043 (Wyo. 2009) (quotations omitted). Although this standard uses the word "pretext," this inquiry differs from the *McDonnell-Douglas* pretext analysis.

In a *McDonnell-Douglas* analysis, we ask whether Solvay's disciplinary decisions violated federal employment law or laws that make certain motives unlawful. If an employer's proffered legitimate reason for a termination is factually true—for example, Mr. Smothers did commit a safety violation—the reason may nevertheless be deemed pretextual if circumstances suggest that it does not adequately explain the employer's actions—for example, if the employer was more lenient with similarly-situated

-31-

employees who committed the same violation. *See, e.g.*, *Swackhammer*, 493 F.3d at 1167. A pretext finding in a *McDonnell-Douglas* analysis allows a jury to infer that the employer's decision was motivated in substantial part by a *specific* motive made unlawful under federal law—for example, discrimination on the basis of disability as prohibited by the ADA.

In contrast, Mr. Smothers' Wyoming state law claim for violation of an implied employment contract alleges that Solvay's disciplinary decision violated a particular employment term, or provision, in the Handbook. The Handbook provision at issue does not prohibit any particular motive. Nor does it require Solvay to exercise its discretion consistently when responding to different employees' violations. It sets out the disciplinary policy Solvay will follow for its employees.

Thus, to prove Solvay violated his implied employment contract, Mr. Smothers must show that it failed to comply with the disciplinary policy as defined in the Handbook. But the Handbook provision "unambiguously gives [Solvay] the discretion to discharge employees who" violate safety rules. *Burbank*, 11 P.3d at 944. And Mr. Smothers concedes that he violated a safety rule. He has not shown how Solvay's decision to discharge him violated the terms of the Handbook.

If Mr. Smothers ultimately proves that his disability or his FMLA-leave played a substantial role in Solvay's decision to terminate him after his admitted safety violation, he will have shown violations of federal law. But it does not follow that violation of one law means a violation of another law or of a particular contract term.

We therefore affirm the district court's grant of summary judgment to Solvay on Mr. Smothers' breach of contract claim.

## III. CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment as to Mr. Smothers' FMLA and ADA claims. We affirm the grant of summary judgment as to Mr. Smothers' state law claim for breach of contract.