FILED
United States Court of Appeals
Tenth Circuit

July 21, 2025

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DAVID JENNY, an individual,

    Plaintiff - Appellant,

v.

L3HARRIS TECHNOLOGIES, INC., a
Delaware corporation,

    Defendant - Appellee.

No. 24-4032

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 1:20-CV-00152-JNP)**
_____

Andrew W. Stavros of Stavros Law P.C., Sandy, Utah, for Plaintiff-Appellant.

Mark D. Tolman (Michael Patrick O'Brien and Elena T. Vetter with him on the brief), of Parsons Behle & Latimer, Salt Lake City, Utah, for Defendant-Appellee.
_____

Before **MORITZ**, **MURPHY**, and **EID**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

David Jenny, a longtime employee of L3Harris Technologies, Inc. and its predecessors, suffered from recurring cellulitis. His job involved frequent international travel, which aggravated that condition, so he sought and was granted an accommodation that allowed him to book seats with extra leg room on long

flights. Within three months of the accommodation's approval, Jenny was denied

permission to travel for routine business, re-organized out of his leadership role, and

ultimately discharged. He sued L3Harris for discrimination and retaliation under the

Americans with Disabilities Act (ADA) and the Rehabilitation Act.

At summary judgment, the district court acknowledged that Jenny met his

burden under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973), by establishing a prima facie case of discrimination and retaliation

and producing sufficient evidence that L3Harris's explanation for his discharge—that

Jenny asked to be "packaged out"—was pretextual. App. vol. 3, 15. That is usually

enough to send a case to a jury. But citing the exception set out in *Reeves v.

Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the district court concluded

that Jenny's evidence did not sufficiently link his discharge to any discriminatory or

retaliatory motive and granted L3Harris summary judgment. Because the *Reeves*

exception is narrow, and the evidence viewed in the light most favorable to Jenny

does not meet the requirements for invoking it, we reverse.

## Background[1]

L3Harris is a defense contractor that sells technology to government and

commercial customers worldwide. Jenny began working for L3Harris's predecessor

in 1992 and as of June 2019 served as Senior Director of International Business

---

[1] Given the procedural posture of this appeal, we recite the facts viewed in the light most favorable to Jenny. *See Johnson v. Weld Cnty.*, 594 F.3d 1202, 1207 (10th Cir. 2010).

Development. He supervised a team of four or five people and reported to Vice President Kevin Kane. In July 2019, after that predecessor company, L3Technologies, merged with Harris Corporation to form L3Harris, Jenny and his team were moved under Vice President Keith Gentile's supervision.

Jenny traveled often for work, and his division's policy was to book employees in coach-class seats. On one of these business trips, Jenny contracted recurring cellulitis, a painful bacterial infection of the skin and the tissue beneath it. Cellulitis thrives on poor circulation, so extended periods in a cramped, coach-class seat could trigger debilitating flare-ups. The flare-ups caused pain and inflammation that prevented Jenny from walking for days at a time. To address his condition, Jenny submitted a formal request for an ADA accommodation that would allow him to travel in exit-row, business-class, or first-class seating. A human-resources representative approved the request and informed Gentile and Jenny in August 2019.

Over the next three months, Kane repeatedly disparaged Jenny's disability and accommodation requests—including in front of Gentile, who expressed no disapproval of Kane's remarks. And Gentile, in consultation with Kane, denied Jenny's two requests for international travel, even as travel for other members of the team continued apace. One of Jenny's requests was for an annual conference in the United Kingdom that he had previously attended. The other was for a contract-negotiation meeting in the United Arab Emirates (UAE) regarding its national tactical datalink program.

Jenny had pursued the UAE's business for four years. He wrote most of the

requirements the UAE issued in connection with the datalink project and put together a team that secured an initial contract representing $15 million in revenue for L3Harris. The company was poised to earn an additional $200 million in UAE business once the terms of the primary contract were finalized. And Jenny planned to hammer out those details at a negotiation with the UAE. But Kane denied Jenny's travel request for that meeting, even after L3Harris's partner on the deal asked Kane to send Jenny. According to Jenny, without Jenny there to represent L3Harris, the UAE postponed further negotiations and then let the deal collapse entirely.

In addition to denying travel requests, Gentile took steps to remove Jenny from his leadership role. On October 23, Gentile held a meeting at a country club to announce his proposed reorganization of the business-development division. At that meeting, Jenny learned at the same time as his colleagues of Gentile's plan to eliminate Jenny's senior-director position. Further, Gentile announced his plan to install another employee, John Emeney, as Director of International Business Development, a new role that effectively replaced Jenny's. The new position had not been posted internally, contrary to standard practice, and Gentile's plan did not mention a new role for Jenny.

After the meeting, Jenny confronted Gentile about the newly created position and asked why Emeney was being placed in that role. Gentile said he'd heard Jenny didn't want the job. Jenny corrected him—he did want it—and asked Gentile to "fix it." App. vol. 1, 105. Gentile said he'd already sent the proposed personnel change "up the chain" for approval. *Id.* But because the changes hadn't been approved yet,

4

Gentile agreed to "see what [he] could do." *Id.* Jenny then told Gentile that "if he couldn't fix it, [Jenny] want[ed] to go somewhere else in the company." *Id.* at 108. And if all else failed, Gentile should "put a deal on the table" for him to consider. *Id.*

But instead of trying to walk back the reorganization or find Jenny a new role, Gentile contacted L3Harris's Vice President of Human Resources (HR). Gentile told HR that Jenny wanted to be "packaged out" of the company and asked to add him to a "reduction in force" planned for the following weeks. *Id.* at 160. HR directed Gentile to complete a reduction-in-force form, which he did with the help of Kane and others.

On November 7, Kane called Jenny (who was on vacation) to inform him that his job had been "eliminated" and he needed to sign separation paperwork before he could see his severance package. *Id.* at 110. Later, as L3Harris was reconsidering Emeney's appointment to the director position, Gentile defended his decision to discharge Jenny by offering a new, performance-based rationale that was inconsistent with the reduction-in-force justification. Specifically, he explained that Jenny "was never told what his function was in the old structure under [Kane]" and had "a continuity of reoccurring issues in organization, engagement, execution, and capture affecting the team and relations with[]in the entire . . . organization." App. vol. 2, 160.

Jenny sued L3Harris for discriminatory and retaliatory discharge under the ADA and the Rehabilitation Act. Evaluating L3Harris's summary-judgment motion, the district court recognized that Jenny likely established a prima facie case of both

5

discrimination and retaliation and proffered evidence showing L3Harris's stated reason for terminating his employment was pretextual. The district court nevertheless granted L3Harris's motion on the grounds that Jenny presented "insufficient evidence tying . . . Jenny's [discharge] to the fact of his *disability itself* (or, under the retaliation claim, his request for accommodations)." App. vol. 3, 19.

Jenny appeals.

**Analysis**

Jenny argues that the district court improperly applied *Reeves* to grant summary judgment to L3Harris on his employment-discrimination and retaliation claims. We review summary-judgment appeals using the same standard as the district court and affirm "only if . . . the record, view[ed] . . . in the light most favorable to [the nonmoving party], reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Johnson*, 594 F.3d at 1207.

We analyze disability-based employment-discrimination and retaliation claims under the *McDonnell Douglas* burden-shifting framework. See *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1287 (10th Cir. 2022) (ADA claims); *Cummings v. Norton*, 393 F.3d 1186, 1189 n.1 (10th Cir. 2005) (Rehabilitation Act claims). First, the plaintiff "must establish a prima facie case of discrimination or retaliation." *Litzsinger*, 25 F.4th at 1287 (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014)). Second, the employer "must proffer 'a legitimate[,] non[]discriminatory reason for the adverse employment action.'" *Id.* (quoting

6

*Smothers*, 740 F.3d at 538). And third, the plaintiff must "show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *Id.* (quoting *Smothers*, 740 F.3d at 538).

The district court applied the *McDonnell Douglas* framework and determined that Jenny had met its requirements. As to step one, the district court explained that "the close temporal proximity of . . . Jenny's request for an accommodation and his termination from employment, coupled with" the post-accommodation "travel denials," "may very well" have established a prima facie case of discrimination and retaliation. App. vol. 3, 14. Turning to step two, the district court recognized that L3Harris proffered a legitimate, nondiscriminatory ground for firing Jenny when the company alleged that Jenny had "asked to be packaged out" when he spoke to Gentile at the country club. *Id.* at 15. And addressing step three, the district court held that "a reasonable jury could find L3H[arris]'s subsequent rationale for . . . Jenny's termination to be implausible." *Id.* at 18. The district court pointed out that the record, viewed in a light most favorable to Jenny, indicated that he had not requested "near-immediate, unilateral termination without negotiations or further communication." *Id.*

Although that is typically all it takes to defeat a motion for summary judgment in this context, the district court complained that Jenny presented "insufficient evidence tying [his firing] to the fact of his *disability itself* (or, under the retaliation claim, his request for accommodations)." *Id.* at 19. It then granted L3Harris's motion based on the Supreme Court's decision in *Reeves*.

Yet *Reeves* primarily clarified that a plaintiff who has shown pretext under the *McDonnell Douglas* framework generally need not do anything further to avoid summary judgment. *See Reeves*, 530 U.S. at 146–48. In doing so, the "Court rejected the so-called 'pretext plus' standard that required plaintiffs . . . to both show pretext and produce 'additional evidence of discrimination.'" *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1280 (10th Cir. 2010) (quoting *Reeves*, 530 U.S. at 146). So the district court's rationale—that Jenny failed to "t[ie]" his discharge to his disability— starts out on shaky ground. App. vol. 3, 19.

To be sure, *Reeves* also acknowledged that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." 530 U.S. at 148. In those "rare" situations, summary judgment would be appropriate. *Jones*, 617 F.3d at 1282. But the Court has identified only two circumstances where this exception might apply: (1) if "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision" or (2) if "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148.

The district court relied on the first *Reeves* scenario—conclusive record evidence of "some other, nondiscriminatory reason for the employer's decision"—to justify its order. *Id.* It cited the "undisputed" fact that Gentile's intent to fire Jenny

8

"was formed only after the country[-]club conversation" (which was not about Jenny's cellulitis) to speculate that there was a nondiscriminatory reason for L3Harris's decision. App. vol. 3, 19. The court hypothesized, for instance, that Gentile could have "believed [Jenny] was unpleasant, or otherwise insubordinate, or . . . [could] have wanted to prove a point." *Id.* at 20.

But this type of judicial guesswork is the very antithesis of the "conclusive[]" evidence the first *Reeves* scenario contemplates. 530 U.S. at 148. We reserve *Reeves* for cases like *Swackhammer v. Sprint/United Management Co.*, where the plaintiff's "mere conjecture" that she faced gender discrimination fell short because "the record conclusively revealed two nondiscriminatory explanations" for her discharge: misconduct and cronyism. 493 F.3d 1160, 1171–72 (10th Cir. 2007). Summary judgment was appropriate there because "whichever evidence the factfinder might have chosen to credit, neither version permits an inference of . . . discrimination." *Id.* at 1172. Here, by contrast, the record would permit a reasonable factfinder to conclude Gentile's decision to discharge Jenny was tainted by animus, as were his decisions to deny Jenny's travel requests and remove him from his leadership role in the first place. Thus, this case does not fall under the first *Reeves* scenario.

Nor does the second *Reeves* scenario—little evidence of pretext and "abundant and uncontroverted independent evidence" negating discrimination—save L3Harris.[2] 530 U.S. at 148. To begin, there was plenty of evidence that L3Harris's initial

---

[2] Although the district court's order did not explicitly analyze this scenario, the parties' briefing does, so we address it here.

explanation for his termination—that Jenny requested to be "packaged out," App. vol. 1, 160—was "unworthy of credence," *Jones*, 617 F.3d at 1280 (quoting *Reeves*, 530 U.S. at 147). Among other things, the record shows:

- after learning of Jenny's disability and accommodation, Gentile engaged in a pattern of discriminatory conduct, including listening to Kane's disparaging comments without disapproval and denying Jenny's travel requests, *see Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (finding pretext based on pattern of pernicious conduct that "culminate[d] later in actual discharge");

- Gentile used an opaque reorganization process to remove Jenny from his position and install Emeney in a nearly identical leadership role;

- Gentile failed to adhere to his agreement with Jenny to try to "fix" the situation by either retaining Jenny in his existing position or finding him another position within the company, App. vol. 1, 105;

- Gentile failed to make a severance offer after Jenny indicated interest in further negotiations; and

- the company gave "shifting explanations" for firing Jenny, *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018), including presenting a performance-based reason for his discharge that was entirely inconsistent with the reduction-in-force rationale given to Jenny.

A court would be hard-pressed to characterize this evidence as creating "only a weak issue of fact as to" pretext. *Reeves*, 503 U.S. at 148.

L3Harris's arguments to the contrary hinge on improperly spinning the facts in the company's favor. For example, L3Harris asks us to excuse Gentile's failure to find Jenny a new position or make him a severance offer by inferring that Gentile genuinely believed Jenny wanted to leave and simply "did not recall, or did not want to honor, a request for a further conversation." Aplee. Br. 39. Similarly, the company asks us to brush aside Gentile's shifting justifications for firing Jenny as motivated

by Gentile's desire to defend the reorganization he spearheaded. But at summary judgment, we must draw reasonable inferences in *Jenny's* favor, not the company's. *See Swackhammer*, 493 F.3d at 1167. And we treat Gentile's oversights and contradictory statements as exactly what they are—evidence of pretext.

And "even if we were to assume that [Jenny] 'created only a weak issue of fact as to whether [L3Harris's] reason was untrue,' the corollary 'abundant and uncontroverted independent evidence that no discrimination had occurred' d[oes] not exist in this record." *Jones*, 617 F.3d at 1281–82 (quoting *Reeves*, 530 U.S. at 148). No undisputed facts explain Gentile's eliminating Jenny's position without notice or explanation, refusing to honor his promise to "fix" the situation, and then offering entirely contradictory and unexplainable reasons for firing him. Instead, these facts point towards a decision tainted by animus.[3] So the second *Reeves* scenario involving "uncontroverted" evidence of nondiscrimination is irrelevant here. 530 U.S. at 148. The district court thus erred in granting summary judgment to L3Harris based on *Reeves*'s narrow exception.

---

[3] L3Harris counters that the only evidence of animus came from Kane, who played no role in discharging Jenny. And to be sure, unlawful-discharge claims typically require evidence of animus by the "firing agent" (here, Gentile) rather than another employee (such as Kane). *Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011). But L3Harris's argument assumes Gentile exhibited no animus of his own. And the record, viewed in Jenny's favor, shows the opposite: Gentile endorsed Kane's discriminatory views with his silence and denied routine travel requests that Jenny's accommodation would have applied to. This sets Jenny's case apart from *Lobato v. New Mexico Environment Department*, where the employer was not liable because the record established that the firing agent's decision was unaffected by bias. 733 F.3d 1283, 1294–96 (10th Cir. 2013).

Finally, we reject L3Harris's attempt to recharacterize the district court's decision as a straightforward application of the traditional *McDonnell Douglas* pretext inquiry. The company cherry-picks language from our precedent to argue that "simply disbelieving the employer['s proffered legitimate reason for firing the plaintiff] is insufficient" to satisfy the framework's third prong. *Piercy v. Maketa*, 480 F.3d 1192, 1201 (10th Cir. 2007) (quoting *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). But we have repeatedly held that to survive summary judgment, a plaintiff need only "present[] evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason." *Jones*, 617 F.3d at 1280 (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005)). To the extent we have looked beyond pretext for alternative evidence of animus in employment decisions, we did so because the plaintiffs in those cases never proffered sufficient evidence of pretext to begin with. *See Piercy*, 480 F.3d at 1201 (concluding that "nothing suggests the proffered reasons for termination are weak, implausible, or inconsistent" or that the employer "acted in bad faith"); *Young*, 468 F.3d at 1250–51 (explaining that plaintiff "offer[ed] no evidence" the employer "believed anything other" than the proffered bases for discharge). That is not the case here, as we have outlined above.

In sum, we agree with the district court that Jenny cleared the standard pretext hurdle; holding otherwise would ignore *Reeves*'s plain rejection of a pretext-plus standard. *See* 530 U.S. at 147–48. But we part ways with the district court as to its application of the *Reeves* exception, so Jenny's claims must go to a jury.

12

**Conclusion**

Because Jenny satisfied the *McDonnell Douglas* framework and the narrow *Reeves* exception does not apply, we reverse the district court's order granting L3Harris summary judgment and remand for further proceedings.

24-4032, *Jenny v. L3Harris Technologies, Inc.*
**EID**, J., concurring.

I join the Court's opinion in full. I write separately only to underscore the problems with *McDonnell Douglas* and its fixation on pretext—problems that are especially pronounced in cases like this one, where the facts presented at summary judgment make the case close enough to go to a jury.

The "focus on pretext has shifted the emphasis of an employment discrimination case away from the ultimate issue of whether the employer discriminated against the complaining employee," instead leading courts to analyze pretext using "artificial categories of evidence" or unnecessary orders of proof. Timothy M. Tymkovich, *The Problem with Pretext*, 85 Denv. L. Rev. 503, 505, 529 (2008). Although *Reeves* attempted to steer the pretext inquiry back toward "an ordinary sufficiency of the evidence standard," *id.* at 507–08, its approach to pretext still sows confusion.

Part of the problem is that *Reeves* invites courts to consider "a number of factors" in evaluating pretext, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" in support of the motion. 530 U.S. 133, 148 (2000). Those considerations are in tension with the summary-judgment standard, under which courts are not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"—and, in doing so, are to view

the record in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

And by the time a district court reaches the pretext inquiry, there will almost always be a triable issue of fact as to discrimination:  for a court to reach the third step, the plaintiff must have already produced evidence sufficient to support a prima facie case, while the defendant must have produced evidence sufficient to "raise[] a genuine issue of fact as to whether it [actually] discriminated against the plaintiff." *Tex. Dep't of Cmty. Aff's v. Burdine*, 450 U.S. 248, 254 (1981).  In other words, if a case has made it to the third step (such that *Reeves*'s pretext inquiry has come into play), both parties by that point will usually have met their burden of production, leaving only the question of whose explanation to believe—which is a question of fact for the jury to decide.  *Cf. Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 643 (7th Cir. 2002) ("[T]he fact that the defendant may be able to produce evidence that the plaintiff was fired for a lawful reason just creates an issue of fact: what was the true cause of the discharge?").  It would defy Rule 56 for district courts to weigh the relative strength of the plaintiff's evidence against the defendant's, as *Reeves* might be read to suggest.

*Reeves*'s hyper-fixation on pretext is just one of many problems with the *McDonnell Douglas* framework.  In short, the three-part burden-shifting framework is a "judge-made rule" that lacks any basis in the text of Title VII, creates "outsized judicial confusion" by requiring courts to maintain "artificial" categories of evidence, and ultimately demands too much of plaintiffs at summary judgment.  *Ames v. Ohio*

2

*Dep't of Youth Servs.*, 605 U.S. _, 145 S. Ct. 1540, 1548, 1551 (2025) (Thomas, J., concurring).  The framework, moreover, "was not designed with summary judgment in mind":  it was originally "developed for use in a bench trial" to help trial courts weigh the parties' evidence and "make an ultimate finding as to liability"—a task that eclipses a court's role at summary judgment.  *Hittle v. City of Stockton*, 604 U.S. _, 145 S. Ct. 759, 760 (2025) (Thomas, J., dissenting from denial of certiorari).

Yet while the *McDonnell Douglas* framework is, "at most, a '*procedural device*,'" courts nevertheless routinely treat it "as a substantive legal standard that a plaintiff must establish to survive summary judgment."  *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993)).  In that way, the framework "obfuscates the critical inquiry" at summary judgment in employment discrimination cases—that is, whether the undisputed evidence would allow a reasonable jury to find that the employer intentionally discriminated against the plaintiff.  *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 951 (11th Cir. 2023) (Newsom, J., concurring).[1]

It should come as no surprise, then, that *McDonnell Douglas* has faced mounting scrutiny over the years.  *See, e.g.*, *id.* (Newsom, J., concurring); *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008) (Kavanaugh, J.);

---

[1] Notably, although the Supreme Court "has assumed without deciding that the *McDonnell Douglas* framework applies at summary judgment," it has "never had occasion to decide whether the *McDonnell Douglas* framework is a useful or appropriate tool for evaluating any kind of claim at summary judgment."  *Ames*, 605 U.S. at _, 145 S. Ct. at 1553 n.4 (Thomas, J., concurring) (citation omitted). Nevertheless, our Circuit has treated it as the presumptive mechanism by which to resolve employment discrimination claims at summary judgment.  *See, e.g.*, *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225–26 (10th Cir. 2000).

*Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring). Even judges in this Circuit have raised doubts about the propriety of *McDonnell Douglas* in both the summary-judgment context and other postures. *See, e.g.*, *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1144 (10th Cir. 2024) (Hartz, J., concurring); *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1221–28 (10th Cir. 2003) (Hartz, J., writing separately) (arguing *McDonnell Douglas* causes courts to "los[e] sight of the ultimate issue" at summary judgment—which is "whether the evidence supports a finding of unlawful discrimination"); *Walton v. Powell*, 821 F.3d 1204, 1211 (10th Cir. 2016) (Gorsuch, J.) ("[T]he tide runs against *McDonnell Douglas* as strongly as it does for a good reason[,] for the test has proven of limited value even in its native waters.").

I share those doubts. In my view, *McDonnell Douglas* is inapt for the summary-judgment context, and *Reeves* has created more problems than it has solved. This case provides a good example. By too rigidly adhering to the *McDonnell Douglas* framework and to *Reeves*, the district court here overlooked pieces of evidence that raise a genuine dispute about whether L3Harris's decision to terminate Jenny was in fact motivated by discrimination.

Although the district court determined that Jenny had set forth facts sufficient to establish both a prima facie case of discrimination and pretext, it nevertheless concluded that there was "yet insufficient evidence" tying Jenny's termination "to the fact of his *disability itself*." App'x Vol. III at 18 (emphasis in original). That is because, according to the district court, Gentile only decided to terminate Jenny *after*

4

their conversation at the off-site meeting.  But several facts undermine that conclusion—including the fact that, by the time of Jenny and Gentile's conversation, Gentile had already surreptitiously begun planning to remove Jenny from his position and replace him with Emeney.  Moreover, the district court overlooked evidence that supported Jenny's prima facie case, including the timing between Jenny's accommodation request and his termination, as well as Gentile's conflicting explanations for Jenny's termination, ongoing denials of Jenny's travel requests, and disparaging behavior toward Jenny.  From that evidence, a reasonable juror could conclude that Gentile and L3Harris's decision to terminate Jenny was in fact motivated by discrimination and animus based on Jenny's disability.

Ultimately, the district court should have focused on the true Rule 56 question: whether the record, viewed in the light most favorable to Jenny, would allow a jury to infer intentional discrimination.  *See Wells*, 325 F.3d at 1224 (Hartz, J., writing separately).  Framed in that way, the answer here should have been yes.  Thus, as the panel correctly holds, the district court's grant of summary judgment was in error.  The panel correctly applies a narrower view of *Reeves*, marking a much-needed shift away from the fixation on pretext that *McDonnell Douglas* has enabled.

With those observations in mind, I concur.

5